**NATIONAL LABOR RELATIONS BOARD**

v.

**EAST TEXAS STEEL CAST-INGS CO., Inc.**

No. 14459.

United States Court of Appeals
Fifth Circuit.

March 31, 1954.

Rehearing Denied May 7, 1954.

David P. Findling, Assoc. Gen. Counsel, N. L. R. B., A. Norman Somers, Asst. Gen. Counsel, N. L. R. B., Milton Eisenberg, Atty. Gen. Counsel, N. L. R. B., George J. Bott, General Counsel, Frederick U. Reel, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

O. B. Fisher, J. D. McLaughlin and H. B. Harrison, all of Paris, Tex., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

BORAH, Circuit Judge.

This case is before the court on petition of the National Labor Relations Board, seeking enforcement of its order requiring respondent, East Texas Steel Castings Company, Inc., to cease and desist from discouraging membership in any labor organization of its employees by discriminatorily refusing to hire, or discharging or refusing to reinstate any of them, or by discriminating in any other manner in regard to their hire or tenure of employment; from refusing to bargain collectively with the United Steel Workers of America, C. I. O., as the exclusive representative of all its employees in the appropriate unit; from engaging in surveillance of union meetings, questioning its employees concerning their union membership, threatening them with reprisals, or discriminatorily carrying out any physical examination programs for the purpose of discouraging union membership; and in any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed them under Section 7 of the Act, 29 U.S.C.A. § 151 et seq. The order further directed respondent to offer immediate and full reinstatement to twelve named employees and to make them whole for any loss of pay they may have suffered by reason of respondent's conduct; to offer A. L. Christian immediate employment as a crane operator and to make him whole; to bargain collectively with the United Steel Workers, C. I. O., as the exclusive bargaining representative of all the employees in the appropriate unit; and to post appropriate notices at its plant in Longview, Texas.

At the threshold of this case we are met with a variety of tenuous jurisdictional questions. First, respondent insists that no original charge was ever filed against it. The burden of this contention seems to be founded on the fact that the original charge, filed on April 26, 1951, and served the same day by postpaid registered mail, erroneously named the "East Texas Electric Steel Company" as the employer. Eleven days later a first amended charge was filed to cure the error by correctly naming respondent, East Texas Steel Castings Company, Inc., as the employer against whom the charge was brought. Secondly, respondent contends that no one in fact at any time charged it with a violation of section 8(a) (5) of the Act. The record discloses that the original charge, dated April 20, 1951, the first amended charge, dated May 7, 1951, and the second amended charge, dated September 10, 1951, all alleged in substance that on various dates between April 10, 1951, and August 29, 1951, respondent had engaged in unfair labor practices within the meaning of section 8(a) (1) and section 8(a) (3) of the Act. On September 21, 1951, a third amended charge was filed against respondent. This amended charge reiterated the alleged violations of section 8(a), subsections (1) and (3), and added an allegation to the effect that on or about September 7, 1951, respondent refused to bargain with the United Steel Workers of America, C. I. O., in violation of section 8(a) (5) of the Act.

As to the first contention, that no formal charge was filed against or served on respondent, there is nothing to indicate that respondent was in any way misled or prejudiced by the clerical error, which was corrected eleven days after the original charge was filed and served on respondent. Moreover, we do not agree with the respondent's view that this was the same as issuing a complaint without a charge being filed. Surely the correction of minor errors of this nature is a proper function of the amended charge.

Respondent's second jurisdictional point is no better taken. It is true that the third amended charge introduced for the first time an allegation of violation of section 8(a) (5) of the Act. However, the alleged violation of section 8(a) (5) did not occur until almost five months after the original charge was filed. Section 10(b) of the Act provides in part that no complaint shall issue based upon any unfair labor practice

occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made. Here, the charge and the amended charges were all filed with the Board within six months following the occurrence of the events to which they related. Accordingly, we think the Board had jurisdiction to consider the alleged violation of Section 8(a) (5) of the Act.

■ Respondent's contention that the Board failed to afford the parties an opportunity to adjust and settle their differences and thus failed to comply with the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., does not merit discussion. When this point was first raised at the hearing, the Trial Examiner immediately recessed the proceeding to afford the parties an opportunity to settle their differences but no settlement was reached.

This brings us to the numerous questions involving the alleged discriminatory discharges. In substance the amended complaint alleged and the answer denied that on various dates from April to September, 1951, the respondent discriminatorily dismissed and refused to hire seventeen named employees[1] to discourage membership and activity in the union. In his report the Trial Examiner recommended that the allegations of the complaint relating to R. L. Manning, Hulan Laminack, and R. M. Richardson be dismissed. Upon review, the Board adopted the Trial Examiner's findings and conclusions save those relating to Odes Laminack, which the Board reversed.

■ After careful study of all of the evidence in the case, we are of the opinion that the record adequately supports the Board's findings in so far as they relate to all six of the so-called "physical examination discharges."[2] In general, the facts are these: On April 9, 1951, an organizational meeting of respondent's employees was held at an intersection of two highways, called the "Y". During the course of the meeting respondent's personnel director and works manager were observed circling the "Y" in an automobile. The following morning, while talking in a group, Lockridge, Z. B. Jones, and Newsome were approached by Williams, respondent's assistant superintendent. Williams told the three employees that they had been seen at the organizational meeting which was held at the "Y" the day before and inquired as to whether they had joined the union. Later, the same day, Lockridge and Z. B. Jones were called from their work and sent to a Doctor Swinney for physical examinations. The doctor found that Lockridge suffered from asthma and that Jones had varicose veins. Respondent argues that it was for these physical reasons that Lockridge and Z. B. Jones were discharged immediately. One week later Newsome, the third member of the group questioned by Williams, was also sent to Dr. Swinney for a physical examination and, thereafter, he was discharged, allegedly because of varicose veins.

The record discloses that Lockridge was employed at the plant in January, 1946. At that time he was given a physical examination and was hired despite the fact that he then had an asthmatic condition. Lockridge testified that he had not been bothered in any way by his asthma up until the time of his discharge, that he had never been to a doctor for treatments of any kind, and had not because of his condition lost any time from work during the five year period when he was employed at the plant.

1. The named individuals are:
 Hulan Laminack, R. M. Richardson, A. L. Christian, Odes Laminack, T. L. Lockridge, Z. B. Jones, Ezekiel Rogers, W. C. Bogan, G. Newsome, R. L. Manning, Burley French, Lois Gentry, James Carpenter, J. L. Pritchett, Rufus Denton, Vincent Guice and R. H. Jones.

2. Those allegedly discharged for physical reasons are:
 T. L. Lockridge, Z. B. Jones, Garland Newsome, Ezekiel Rogers, Wilson C. Bogan, and Burley French.

The second member of the group, Z. B. Jones, age 37, was first employed at the plant in 1948. At that time Jones was given a physical examination by Dr. Swinney and was asked as to the condition of his leg to which Jones replied that he had had varicose veins since he was 14 years old. Nonetheless, he was hired. Garland Newsome's case is similar to that of Jones. Newsome had had varicose veins for approximately 20 years. He was employed in 1948, and the varicose vein condition had never bothered him in his work or otherwise. Following his discharge by respondent because of claimed physical unfitness due to the presence of varicose veins, Newsome passed the required physical examination and was employed by the General Motors Company in Saginaw, Michigan. The fourth physical examination dischargee was Ezeckiel Rogers. Rogers commenced work at the plant in 1943 and later became a swing grind operator. He also attended the organizational meeting at the "Y" on April 9, 1951. On April 12, 1951, he was sent to Dr. Swinney for a physical examination. Dr. Swinney found that Rogers had high blood pressure and a heart murmur. Respondent claims that it was because of this physical disability that Rogers was discharged the next day. However, immediately following the dismissal Rogers was examined by a Dr. McCree, who found nothing wrong with his heart and informed him that his blood pressure was satisfactory. Moreover, Rogers thereafter successfully passed the pre-employment physical examination required by the Brown & Root Company and he was employed by that Company to do strenuous work. The fifth physical examination dischargee, Wilson C. Bogan, began work at the plant in 1946. He was prominent in union activities and attended the organizational meeting at the "Y". The following day his foreman asked Bogan whether he had attended the meeting. When Bogan admitted that he had attended the meeting and, further, that he approved of the union, the foreman indicated that he did not share Bogan's view as to the value of a union. Four days after the meeting at the "Y" Bogan was sent to Dr. Swinney for a physical examination and was discharged a few days thereafter. Respondent asserts that the discharge was occasioned by Dr. Swinney's finding of high blood pressure. However, Bogan had high blood pressure at the time he passed a pre-employment physical examination and following the discharge Bogan went to work for the Salberg Engineering Company as a welder. Finally, Burley French was discharged for alleged physical reasons. There is no question but that Burley French was not in good physical condition—he had been injured on three occasions while working at the plant. Upon his return to work in early 1951 after recovering from serious burns received at the plant, he was assigned the job of keeping the plant yard clean. On April 27, 1951, French was sent to Dr. Swinney for a physical examination. Dr. Swinney reported that French's general condition was bad but French was not discharged until some four months following the unfavorable physical report. What is more significant is the fact that on the day before his discharge a representation election was held at the plant and the union won. On the day of discharge, the personnel director sent for French and said, "You want the union. I am going to give you the union. Go ahead away from the plant and don't come back or I will have you put in jail."

The evidence which we need not detail, leaves us in no doubt that these discharges were discriminatorily motivated and that the physical condition of these employees was utilized merely as a pretext to conceal respondent's real purpose. When reviewed as a whole in the light of respondent's hostility to the union, we think a definite pattern emerges. In this connection we think it worthy of note that the employees were subjected to examination within a few days after the union's first organizational meeting; that not all employees were physically examined; and that a similar

device apparently was used by respondent's predecessor to rid itself of the union leaders in 1947 when the employees made an abortive attempt to organize. We accordingly hold that the Board's findings in connection with the so-called "physical examination dischargees" are supported by substantial evidence on the record considered as a whole.

■ Turning next to James Carpenter, Rufus Denton, Lois Gentry and Vincent Guice, the four "NLRB hearing dischargees", the record discloses that a representation hearing was held by the Board on June 8, 1951. Carpenter, Denton, Gentry and Guice were four of the five employees present at the hearing either as members of the union committee or as observers.[3] On Monday, June 11, 1951, Lois Gentry was discharged. James Carpenter was discharged the next day, Denton on July 24 and Guice on August 6. We are convinced from our consideration of the record that there is substantial evidence to support the Board's findings as to all of the "NLRB hearing dischargees" save Vincent Guice. In so far as Guice is concerned, we think his own testimony, as set forth in the margin,[4] clearly shows that he either quit or was discharged for impertinence or insubordination. There is no countervailing evidence and the Board's order, to the extent that it relates to Vincent Guice, should not be enforced.

■■ The Board in agreement with the Trial Examiner found that respondent though in need of a crane operator refused to hire A. L. Christian because of his 1947 union activity. The respondent contended before the Board that when Christian applied for this job in April, 1951, it then had no need for a crane operator. Further, that no application was received from Christian. As to these contentions foreman Laminack and asssistant superintendent Williams testified that respondent was then in

3. The fifth employee who attended the representation hearing was Hulan Laminack. Charges relating to Laminack were dismissed by the Trial Examiner. This action was affirmed by the Board.

4. Guice testified in part as follows:

"A. The first time I said anything to him was about a raise. Then, the next time he said something to me, said, I laid off and told him I wanted to go to Tyler and get a drivers' license and I guess somebody told him and he come out and asked me how come I didn't get my drivers' license and I told him I did, but it was late.

"Q. Did you have any further conversation with him? A. He kept on talking to me about that iron there and I asked him, he told me I had better wash up with it by 4:00 o'clock or else.

"Q. What did you say? A. I didn't say nothing to him.

"Q. Did you say anything to him about finding another job, whether you could or couldn't? A. I told him I might find me another or I imagined I could find me another.

"Q. Did he say anything further to you or you to him? A. He told me that I wouldn't be caught up—he told me that if I wouldn't be caught up by 4:00 o'clock, I could hunt me another.

\* \* \* \* \* \*

"Q. Did you tell him that you would get you another job? A. I told him I imagined I could find me another job.

"Q. Now, how long was it after that until you saw Mr. Jones? A. It wasn't five minutes.

\* \* \* \* \* \*

"Q. Now what was said between you and Mr. Jones? A. Well, he walked up and asked me, punched me on the shoulder and—He walked up to me and hit me on the shoulder and told me, said, 'You told Arant you could get another job.' He said, "You had better not tell me that or you will get to hunt another job."

"Q. Now, wait a minute, or you will get to hunt? Is that what I understand? A. Yes, sir.

"Q. And what did you say? A. I told him the same thing and he told me to.

"Q. What did you tell him? A. I told him I imagined I could find me another job.

"Q. And what did he say? A. He told me to come on with him and he would get my card and punched it out and told me to wait on the office porch.

"Q. And that is the way you left the plant? A. Yes, sir, I done see him punch my card out, there wasn't no need of my going back down there & work."

need of the services of a crane operator and Christian whose testimony was corroborated in several essentials by Laminack testified that he applied for the job through Laminack and then through another official and later filed an application with the company. The Board credited the testimony of these witnesses and its findings based upon substantial evidence should not be disturbed.

 The Board found that John L. Pritchett was discharged because of his union activity. We do not agree. In the first place, outside of belonging to the union and soliciting a few employees to join up, he does not appear to have been unusually active in union affairs. And secondly, there is no doubt whatever but that his operation of the crane was unsatisfactory. On June 18, 1951, assistant superintendent Williams submitted the following personnel report to works manager Furlani:

"John L. Pritchett Clock No. 124 has on several occasions in the past been unnecessarily reckless in operating the overhead crane.

"During the week of June 4th to 9th I had some complaints of carelessness from the foreman. While he was under my observation at this time he spilled a load of flasks endangering the chain men and caused additional work and delay on their part. In one instance he left the cab with the sling chain swinging in a circle directly over some molds ready for pouring. The chain dragged across the top of the molds knocking the covers off and crushed off a considerable amount of sand into the molds which had to be removed.

"On June 18th he again spilled a load of flasks endangering bodily harm to the chain men and did cause damage to molds ready for pouring.

"He has shown no inclination to correct these unsafe work habits. His attitude has been that these incidents were a joke on the chain men.

"On many occasions he has delayed operations by not being on duty in the crane.

"He was duly instructed as to his responsibility when he was assigned to the overhead crane.

"Due to the fact that he has been under the supervision of Mr. Hall for only a short time I am recommending that on the next occasion of his disregard for safe work practices he should be discharged."

Two days later Pritchett had another accident and he was discharged. In reference to what transpired at the time he was fired, Pritchett testified:

"Q. Give us that conversation, please. A. He called, had my foreman call me down and said Mr. Williams wanted to talk to me and I went to where Mr. Williams was and he said he was standing pretty close by my accident this morning. He said he was going to discharge me, not exactly for the accident, but for my actions afterward. He said I laughed about it or something."

We are of the opinion and hold that there is no substantial evidence on the record considered as a whole to support the Board's findings in regard to Pritchett. Clearly, he was discharged because of the fact that he was a bad crane operator. Accordingly, so much of the order as relates to Pritchett should be and hereby is set aside.

 We agree with the Board's findings that respondent refused to bargain collectively with the United Steel Workers of America, C. I. O., and discriminatorily discharged the union's president, Roy H. Jones, because he insisted that a piecework or incentive system, which respondent sought to apply to his department, be negotiated with the union. The record discloses that on September 6, 1951, the Board certified the union as the exclusive bargaining representative of an appropriate union of the employees. The following day a representative of the union addressed a letter to respondent requesting a meeting

for the purpose of negotiating a contract covering wages, hours, and other conditions of employment. In this letter respondent was advised that Roy H. Jones had been elected president of the local union. On September 10, 1951, respondent proceeded to put into effect a new pay schedule for the molding crew, which included Jones, without consulting with or even notifying the certified collective bargaining representative of its employees. On September 11, Jones and the other employees on the molding crew protested against continuance of the new pay schedule and asked Furlani, the works manager, to negotiate the question with the union. In refusing, the works manager facetiously replied that he did not belong to the union and had nothing for the union to do. Furlani then asked Jones, the spokesman for the molding crew, whether he was refusing to work. Jones replied that he was not refusing to work under the old system but he did not desire to work under the new incentive system. Furlani then directed Jones to punch out. The following day Jones and union representative Murphy demanded that Jones be reinstated and that respondent negotiate concerning the piecework pay system. Thereafter respondent informed Murphy that Jones would not be reinstated. Under these circumstances the discharge unquestionably was violative of the Act. Moreover, it is clear that the facts fully substantiate the Board's finding that by discharging Jones and declining to negotiate with the union concerning the incentive system, respondent failed and refused to bargain in good faith in violation of section 8(a)(5) and (1) of the Act.

Next, respondent contends that substantial evidence does not support the Board's finding that respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed them under section 7 of the Act by engaging in interrogation or surveillance. Suffice it to say that although respondent's activities in this regard apparently were not widespread, we are in no doubt that the Board's findings in this regard should not be disturbed.

Finally, respondent asserts most earnestly that the Trial Examiner was biased and prejudiced against it and, therefore, did not accord respondent a fair and impartial hearing. We have given this contention careful consideration, and have concluded that although the Trial Examiner was perhaps over-zealous in pursuing his avowed purpose of not wasting time—particularly when respondent's counsel was conducting cross-examination—and manifested a somewhat more strict view as to the relevancy of certain evidence sought to be elicited by respondent than we think was necessary, we cannot on this cold record say that a finding of bias and prejudice is warranted.

For the reasons stated, the order of the Board, as modified herein, shall be Enforced.