**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FOX MANUFACTURING COMPANY, Respondent.**

**No. 16038.**

United States Court of Appeals Fifth Circuit.

Nov. 6, 1956.

Theophil C. Kammholz, General Counsel, Samuel M. Singer, James A. Ryan, Attys., National Labor Relations Board, Washington, D. C.

Paul L. Harper, Atty., N. L. R. B., Atlanta, Ga., Marcel Mallet-Prevost, Asst. Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, Washington, D. C., for petitioner.

Welborn B. Cody, Atlanta, Ga., Hoke Smith, Jack Etheridge, Atlanta, Ga., Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Ga., Matthews, Maddox, Walton & Smith, Rome, Ga., of counsel, for respondent.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for the enforcement of an order of the National Labor Relations Board ordering respondent to restore to employment, with back-pay, one Clayton White and to cease from engaging in various activities designed to prevent unionization of respondent's plant.

The principal issue is whether the Board's finding of such anti-union activities, and in particular its finding that White was discharged because of his union activities and not for proper cause is supported by "substantial evidence on the record as a whole." [1]

The chronology of the significant events in this case is as follows (except where otherwise indicated the occurrence is not seriously controverted by either party):

From 1942 to 1948 respondent's plant had been organized by the United Furniture Workers of America, CIO; the loss of unionization in 1948 was not due to any activities of the respondent.

March 1950—Clayton White was hired as a sander at 75 cents an hour.

July 1953—White was promoted to sprayer.

On at least three occasions during the next sixteen months, approximately in August 1953, November 1953, and June 1954 White turned out a batch of work that was unsatisfactory—in spraying tables he achieved too light a shade and the furniture had to be refinished; no formal reprimands were administered at those times. In general his work was considered satisfactory and he received several raises in pay to $1.05 an hour.

On several occasions between April 1954 and January 1955 Plant Superintendent Wert, in interviewing applicants for employment, asked them about their union affiliation and declared to them that the plant now no longer had a union and he didn't believe a union would work there.

Early in November 1954 the former union attempted a come-back and started an organization drive in the plant.

On November 12, 1954, White and another employee, Thomas Caldwell, signed union cards. These two then became the most active union supporters in the plant; until his discharge in December White himself signed up 18 to 25 members for the union.

---

1. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Shortly after the organization drive started in November, Foreman Callahan suggested to one employee that if the union came the working time and pay of the workers would be reduced from 54 hours to 40 hours per week. (The circumstances of this conversation are controverted by respondent).

On three occasions during the next month Callahan spoke briefly to White about his union activities (respondent admits only the second occasion). On November 15, three days after White had signed the card, Callahan said: "I hear you are trying to organize a union up here."—the subject was dropped upon White's denial. On November 22 Callahan asked White how the union was going. White again denied any knowledge. On December 13 Callahan stated: "I hear you are having something to do with the union." White suggested that was his privilege and Callahan concluded: "Well, that is a good way to get your job."

On December 13 White again completed a batch of tables that were shaded too light, but after Callahan had complained about them he directed that they be passed without refinishing.

On December 16 the attention of Plant Manager Anderson was called to another batch of tables just finished by White. Anderson told White they were too light and asked for a reason; when White gave none Anderson directed Callahan to discharge White immediately: "I don't want him nowhere in the plant."

A few days later Caldwell, the other employee most active in the union, was called in for a discussion of his work by Superintendent Wert. He was accused of working too slowly and was given a warning slip. The Board contends, on the basis of Caldwell's testimony, that the accusation was presented in such a way as to make it clear that not his work but his union activities were at issue. Caldwell is still employed by respondent.

In the summer of 1955 a certification election was won by the union. (This is not in the record but is introduced in respondent's brief and it may be judicially noticed.)

The principal issue is the real motive for the discharge of White. Respondent contends that he was discharged for unsatisfactory work; it is not disputed that on his final day he produced a batch of tables that were unsatisfactory. Admittedly there were at least four previous occasions on which that had occurred, necessitating an expensive refinishing job, the last one three days previous to discharge; respondent also introduced the testimony of several non-supervisory employees who had the duty of inspecting White's work, who stated that off-color batches were produced rather frequently by White—though none could recall other specific incidents. Respondent asserts that White was an irregular worker with frequent unexplained ups and downs; that several attempts had been made to help him keep his work up to par through the advice of his supervisors and fellow workers; and that on the final day Anderson simply concluded that there was no hope of making White into a consistently good worker.

The Board asserts that it really appears that the evidence showed that on only four instances during the sixteen months preceding the firing did White produce work that was so unsatisfactory that it came to the attention of the foreman—and the inspection system was admittedly strict. It was testified that it is practically impossible to avoid occasional divergencies in shade, and the testimony suggests that the present sprayer, whom respondent considers satisfactory, also had difficulties from time to time. The foreman and others had testified that White was generally a good worker assigned to do the most delicate job in the department; his several pay raises also testify to the company's satisfaction. The Board points out that respondent proudly claims that it does not easily discharge anyone without giving him a second chance and that the total dismissal rate is very low; in this instance, however, the dismissal was remarkably abrupt as shown both by An-

derson's words and by the fact that White was not even permitted to complete the work day or week, as had been done in the case of some other dismissals.

The remaining issues involve the other asserted anti-union activities of the respondent.

■ Viewed against the background of the many cases of this type decided in this circuit, it must first be said that the Board acted on a relatively meager showing of anti-union bias, so meager in fact that it is quite doubtful whether it would have been the subject of Board action if it had not been for the discharge of White. Nevertheless, if there is substantial evidence on the record taken as a whole which permits the inference that questioning of job applicants and employees as to their attitude towards the union and that comments that unionization will cause a reduction in hours and that union activity might cost a man his job amount to threats or coercion, then we may not substitute our judgment for the Board's in reviewing its finding that these acts showed a purpose to interfere with the employees' rights in violation of Section 8(a) (1) of the Act, 29 U.S. C.A. § 158(a) (1). N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406; N. L. R. B. v. Newton Co., 5 Cir., 236 F. 2d 438.

■ The matter of the discharge of White, however, stands differently. We have repeatedly held, of course, that the finding of unlawful interference under Section 8(a) (1) of the Act is not enough of itself to make a discharge a wrongful one. N. L. R. B. v. Newton Co., and N. L. R. B. v. McGahey, supra. The rule followed by this Court in testing the adequacy of the record evidence to support a finding of a Section 8(a) (3) violation has been considered frequently within the recent past.

The decision in N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 211 F.2d 848, 854, included the language "When the Board could as reasonably infer a proper motive as an unlawful one, substantial

evidence has not proved the respondent to be guilty of an unfair labor practice." This same standard or rule was made the basis of the decision in N. L. R. B. v. Huber & Huber Motor Express, Inc., 5 Cir., 223 F.2d 748. Subsequently, however, in the Coats & Clark opinion (N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567, 572) written by Judge Rives, the author of the Houston Chronicle opinion, and a member of the court passing on Huber & Huber, this Court said:

"Probably some amplification and modification of that [Houston Chronicle] rule is here appropriate.

"We agree that the initial choice between two equally conflicting inferences of discriminatory or nondiscriminatory employer motivation for an employee discharge is primarily the province of the Board, for under the Universal Camera Corp. case, supra, and its substantiality test of review, previously accorded statutory recognition in § 10 (e) of the Act [29 U.S.C.A. § 160 (e)], this Court 'may [not] displace the Board's choice between two fairly conflicting views' and inferences, 'even though the court would justifiably have made a different choice had the matter been before it de novo.' 340 U.S. 474, 487–488, 71 S.Ct. 456, 465 [95 L.Ed. 456]. But granting that we may not disturb the Board's choice between equally conflicting inferences where we find both a lawful and unlawful inference of employer motivation 'equally reasonable', we think the rationale of all the cases cited does permit our displacement of the Board's initial choice where, as here, we find no substantial evidence on the record considered as a whole, Universal Camera Corp. v. N. L. R. B., supra, to support the inference drawn by it as 'reasonable', and to the contrary, deem it contrary to uncontradicted testimony clearly showing a lawfully motivated discharge 'for cause' under § 10(c) of the act. N. L. R. B. v.

Blue Bell, Inc., 5 Cir., 219 F.2d 796, 798; N. L. R. B. v. General Drivers, etc., 5 Cir., 225 F.2d 205, 211."

The modification of the Houston Chronicle rule by Coats & Clark is quite significant. Under Houston Chronicle, the court had the duty of ascertaining whether there was substantial evidence on the record as a whole to make the inferences of legal and illegal discharge reasonably equal. If the record warranted the conclusion that they were reasonably equal, then the court would have to find in favor of the alleged legal ground for a discharge (reversing the Board if necessary), for this Court said that where the Board could as reasonably infer a proper motive as an unlawful one, there was a failure of substantial evidence to sustain a finding of an unlawful discharge.

■ Under the rule as announced in Coats & Clark it is still our duty to ascertain whether there is substantial evidence in the record as a whole to make the inferences of legal and illegal discharge reasonably equal. But now if the record warrants the conclusion that they are reasonably equal, we may not overturn the Board's finding of an illegal discharge.

This reasoning and the language of Coats & Clark have been cited with approval in the subsequent cases of N. L. R. B. v. McGahey, supra, and N. L. R. B. v. Newton Co., supra. We follow these decisions as stating the law in this type of case.

■ It is still our duty, however, to ascertain whether there is at least enough substantial evidence from which either inference (i.e., legal or unlawful motive) can be equally found. As said in the McGahey case, "an unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one." [233 F.2d 413.] Placing the record in this case against the factual situation presented in each of these prior cases, we are clearly of the opinion that this record falls short of the mark. It barely supports the charge of Section 8 (a) (1) violation. It fails completely to support the charge of unlawful discharge under Section 8(a) (3).

The petition for enforcement will be denied as to the reinstatement of Clayton White, but it will be granted as to the Section 8(a) (1) violation.

Denied in part.

Enforced in part.