## NATIONAL LABOR RELATIONS BOARD

v.

## COATS & CLARK, Inc.

### No. 16017.

United States Court of Appeals
Fifth Circuit.
Feb. 13, 1957.

Louis Schwartz, Marcel Mallet-Prevost, Asst. Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, Washington, D. C., Theophil C. Kammholz, General Counsel, Samuel M. Singer, Attorneys, National Labor Relations Board, Washington, D. C., for appellant.

Frank A. Constangy, M. A. Prowell, Atlanta, Ga., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for the enforcement of an order of the National Labor Relations Board requiring respondent to offer to restore to employment, without back pay, one Marie Smith Barron, and to cease from engaging in various activities in violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., designed to prevent the unionization of respondent's plant.

The pertinent facts are not seriously disputed. The Textile Workers Union of America, CIO, started an organizing campaign among the employees at respondent's Clarksdale plant at the beginning of January 1953. The drive continued with varying intensity until March 2, 1954, when the union lost a Board-conducted election by a vote of 276–303, to which no objection was made.

Late in 1953 several of respondent's supervisors apparently initiated a campaign to prevent the unionization of the plant. The trial examiner found and the Board agreed that there was evidence of over a score of incidents involving at least eight supervisors and over a dozen employees in which direct and indirect attempts were made to induce the workers to turn against the union. Many of the incidents involved the interrogation of employees about the activities of the union and about their own affiliation or that of other workers, and these were frequently coupled with requests or demands that the employee withdraw from the union by asking for a return of his authorization card. There were threats that if the union was certified the plant would be shut down or operated only part time, and there were thinly veiled threats to fire and to blacklist. Occasionally ridicule was employed. Except for those incidents relating to Mrs. Barron it is unnecessary to detail these occurrences any further since respondent itself does not seriously controvert them, suggesting only that there may be questions of credibility, and arguing that the workers involved were all tough-minded enough to withstand this sort of talk. These, however, are matters to be determined by the Board as the trier of facts.

Respondent suggests that many of the supervisors' remarks were protected by section 8(c) of the Act as mere expressions of opinion. But too frequently they appeared coupled with threats that are expressly excepted from the license of that section, and where, as here, there is substantial evidence on the record taken as a whole to support the Board's finding that these comments showed a purpose to interfere with the employees' rights in violation of section 8(a) (1), this Court will not substitute its judgment for that of the Board. N. L. R. B. v. Fox Manufacturing Co., 5 Cir., 238 F.2d 211, at page 214 and cases there cited.

It is now necessary to consider the principal events that led to the separation from employment of Mrs. Barron. She began working for the respondent in 1947, and since 1950 had worked in the night shift of the spinning department. She was one of the first employees to join the union and to sign a card, and soon became one of its most active supporters. She successfully solicited a number of workers to join up, contacting them at their home at her own house, at the factory during pauses, and even sometimes during work periods. Respondent's supervisors apparently became aware of her activity in the fall of 1953 and from that time her immediate superiors concentrated a good deal of effort to make her change her mind about the union or at least to suppress her activity in its behalf. Early

in November overseer Bowen and "second hand" Jordon talked to Mrs. Barron about her union activity: "You don't think it is any secret, do you, the way you have been sneaking around down there?" and after stating that in other cities the respondent had closed down factories rather than yield to union demands, Bowen said: "I want you to think this over. If you get a union in here, you will be out of work." Some time later Bowen asked Mrs. Barron to reveal the names of other union members among the employees and upon her refusal said: "Marie, you know before they will get a union in here they will shut this mill down, and the Union, the CIO, the Government and nobody else won't open it up." In December she was told that she would have to stop talking while at work, a discipline not formerly imposed on any worker, and evidently insisted on because she was thought to be soliciting workers rather than for the ostensible reason that her talk was interfering with her work; this order was coupled with a threat to fire and later emphasized with some profanity. In February 1954 Jordon told her to "get on the band wagon and go with the rest of them and get her card back." Bowen often made disparaging remarks about the union, its activities, and its entertainments, and when Mrs. Barron once planned to wear a union T-shirt he suggested "you had better get you a tail and pin on it [sic] because you are going to look like a jackass." On the very morning of the election Bowen confronted Mrs. Barron with another employee and accused her of falsely telling the latter that he would be fired; again she was accused of too much talking and a major quarrel ensued.

Mrs. Barron's job since 1950 had been to operate several spinning frames; she was assigned to work 14 at a time, which was apparently the normal quota, though some girls worked 16. It appears that her job was no more difficult than that of other employees, nor was she given any discriminatory assignments. Apparently she was reasonably competent and performed her work satisfactorily, though she, like others, experienced days in which there were more than the usual number of breaks or snarls in the thread; these difficulties had apparently increased since April 1952 at all the frames at the plant since certain automatic cleaning equipment had been installed. Four days after the election Mrs. Barron arrived at work to find her frames so tangled and dirty that they could not be run. She had considerable trouble getting the frames to run and keeping them free from dirt and snarls. After a few hours she requested the help of the instructor, Mrs. Smith, who thereupon started to work a few frames for her. Soon Mrs. Barron told her she was quitting, that she could not "take this any more." Smith urged her to stay. Mrs. Barron disagreed, saying this job would not get any better, and "they won't never lay off me after this is all over, I might as well quit now, I can't stay here any longer." Barron cleaned her frames once more and then told Jordon she was going home. Jordon first laughed but when Mrs. Barron walked back to her frame to get her belongings Jordon followed and said "Marie, if you walk out you know what this means, it means you are through." She replied: "Well, if I hadn't been through, I wouldn't be walking out." Bowen walked up at that moment and asked her what was wrong. She said: "I just can't run this damn job. I never have been able to keep it up. You knew I could not keep it up when you put me up here; I am quitting." Bowen answered: "I am sorry, but we haven't got anything else for you to run," whereupon Mrs. Barron left the plant, without apparently even shutting off the machines she had been operating.

Next morning her employment was formally terminated, and up to the time of the hearing she had never applied for reinstatement.

In testifying about her reason for quitting, Mrs. Barron answered at the hearing: "Well, I just couldn't take it any more. You work and bosses breath-

ing down your neck all the time. * * * Well, what time Mr. Jordon wasn't criticizing my work Phil Bowen was on me about the Union."

On the basis of the above facts the trial examiner found that although superficially it might appear that Mrs. Barron had "had so much trouble with her frames that she quit in disgust, and that dissatisfaction with her job was the motivating reason" and therefore "she refused to handle her work properly, was criticized for it, and finally quit voluntarily rather than cooperate" he was convinced that:

"by the above course of conduct, which started in November 1953, involved numerous remarks and threats violative of the Act, and culminated in the heated argument of March 2nd, Respondent through its supervisors so affected and upset Barron that, when she was confronted at the start of work 3 or 4 nights later with dirty and unworkable frames which she had great difficulty in restoring to working condition even with help, this became 'the straw that broke the camel's back,' so to speak, and she quit in disgust, dissatisfied with the job and the way she had been treated. * * * Considering Barron's prominence in the union campaign, Respondent's knowledge thereof, Bowen's clear hostility to unionization, and his increasingly harsh treatment of Barron, in the light of Respondent's antiunion animus and contemporaneous unfair labor practices toward other employees in this period, I am satisfied that General Counsel had sustained the ultimate burden of proving by a preponderance of credible evidence in the whole record that, as part of its antiunion measures, Respondent first attempted by illegal means to persuade Barron to withdraw from the Union and, failing in that attempt it then subjected her to repeated and unjustified criticism of her work, threatened her with discharge if she did not cease to talk about the Union, and other abuse, which made her job so unbearable that she quit on March 6, 1954, and that Respondent forced her to resign because of her continued adherence to the Union, and thus rid itself of a prominent union organizer. By such conduct, Respondent constructively discharged Barron in order to discourage membership in the Union, in violation of Section 8(a) (3) of the Act * * *."

He recommended that reinstatement with back pay be ordered.

The Board, in a decision reported at 113 N.L.R.B. No. 29, reversed the trial examiner's finding that there had been a "constructive discharge" in violation of section 8(a) (3), apparently on the ground that though the harassing tactics of respondent's supervisors had been a contributing factor inducing Mrs. Barron to quit when and as she did, this outcome had not been the object of respondent's strategy, and the immediate precipitating situation, the dirty frames, was not one for which respondent was responsible or whose outcome it could have anticipated.

Nevertheless the Board, with one member dissenting, decided to order that Mrs. Barron be reinstated, though without back pay, on the ground that respondent's harassment had been a psychological factor entering into her decision to quit, and thus a mere cease and desist order, usually appropriate to mere 8(a) (1) violations, would not completely remedy the effect of respondent's coercive conduct. The Board stated:

"Although we have found that a preponderance of the evidence does not establish that the Respondent constructively discharged Barron, we are nevertheless satisfied that its harassment was a psychological factor which entered into her decision to quit. The immediate incident leading to her quitting was the difficulty she experienced with her

frames the night of March 6, but it is likely that she would not have felt that the job was too much to bear if she had not also been harassed by the Respondent during the course of the Union's organizing campaign. Under these circumstances, our usual cease and desist order would not completely remedy the effect of the Respondent's coercive conduct, since it would not fully rectify the consequences of the Respondent's intimidation of Barron. Because a violation of Section 8(a) (3) has not been adequately proved, Barron *is not entitled* to the normal remedy provided for in such cases, namely, reinstatement with back pay. Our choice of remedial action is, however, flexible enough to order reinstatement without back pay where, in our opinion, it would effectuate the policies of the Act." (Emphasis added.)

It is this order that is now principally objected to by the respondent.

As commented on both in the opinion and the dissent there is no precedent in the 20 years experience of the Board for such action. The Board must rely on section 10(c) of the Act for its authority to shape orders in unfair labor practice cases. The pertinent portions of that section are:

"If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with · or without back pay, as will effectuate the policies of this Act: * * *. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C.A. § 160(c).

The latter sentence was added by the 1947 revision of the Act. Though on its face the Board's authority to require affirmative action appears to be limited only by the amendatory sentence (which respondent argues is sufficient by itself to bar reinstatement in this situation) the courts have held that purely punitive orders are outside of the power of the Board, even though they might be considered as "effectuating the policies of the Act," by making employers wary of even the slightest deviations from its standards. In Republic Steel Corporation v. N. L. R. B., 311 U.S. 7, 11–12, 61 S.Ct. 77, 79, 85 L.Ed. 6, the Supreme Court said:

"This language should be construed in harmony with the spirit and remedial purposes of the Act. We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act. * * *

"In that view, it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end."

The question therefore is whether the reinstatement order under the above circumstances is punitive or merely remedial. In its decision the Board argues that it is the latter for even though Mrs. Barron may under these circumstances not be "entitled" to this remedy, it would serve to dissipate the effect of respondent's coercive conduct. This point is amplified in the Board's brief in which

it is pointed out that unless Mrs. Barron is offered reemployment respondent will continue to enjoy an "advantage which he has gained by violation of the Act," a situation that the Board need not permit under the holding of National Licorice Co. v. N. L. R. B., 309 U.S. 350, 364, 60 S.Ct. 569, 84 L.Ed. 799.

■ The Board thus adverts to two different, though not mutually exclusive aspects of a remedial order: the order may be designed to make someone whole who has been deprived of a recognized interest by acts that constitute a violation of the Act and/or the order may be designed to prevent the violator from benefitting by his misdeed. If neither of those aspects is present it is hard to see how an order may be considered "remedial" as distinct from merely punitive; every punishment made to "fit the crime" is not necessarily remedial, especially if its purpose is more to provide "a source of innocent merriment," i. e. serve as an example, rather than to restore to someone a right he is entitled to or to deprive a malfeasor of an advantage unjustly seized.

■ We agree with the Board that in view of its finding that Mrs. Barron was not constructively discharged she is not "entitled" to reinstatement. It has been held that employees who quit voluntarily may not be reinstated, Texarkana Bus Co. v. N. L. R. B., 8 Cir., 119 F.2d 480, 485; N. L. R. B. v. Scullin Steel Co., 8 Cir., 161 F.2d 143, and this would seem to be especially true in the case of an employee who does not request reinstatement until after the Board has ordered that such a request be favorably considered. There is no showing or finding here that such a request would have been futile or that if there had been a refusal it would have been based on antiunion rather than on economic grounds. Thus if the respondent wished to avoid, as many employers doubtless would, the stigma of having to reinstate an employee under the pressure of a Board order, advertised on every bulletin board in the plant, he would have to solicit the return of employees who quit voluntarily and showed no apparent interest in reinstatement, or decide at his peril that no unfair labor practice psychologically predisposed the employee to leave. Until this predisposition wears off he would thus have to hold the position open, unable to hire a permanent replacement, for in the present instance the Board made no finding that Mrs. Barron's job had not yet been permanently filled. Thus the situation differs from either an unfair labor practice strike or a discriminatory discharge illegal under section 8(a) (3) where the employer is under notice that he will be obliged to reemploy at a definite time; either at the end of the strike in one case, or voluntarily or when the Board's order becomes final in the other.

Moreover we agree with respondent that Mrs. Barron's conduct in leaving without permission and apparently without shutting off her machine during the middle of her shift may have brought her within at least the spirit of the provisions of the restrictive amendment, for had the respondent anticipated her resignation by firing her at that time it would be difficult to say that the Board could infer that the firing had not been for cause,[1] in which case the Board would have been entirely powerless to order reinstatement. It is difficult to see why an employee who anticipates (or gives grounds for) a discharge for cause by quitting voluntarily should be in a substantially better position to demand

---

1. See this Court's recent decision in N.L. R.B. v. Fox Manufacturing Co., supra, for a discussion of the extent to which such a finding by the Board must be supported by the record. Here the determination that there was no "constructive discharge" clears respondent of responsibility for the immediate condition that caused Mrs. Barron to leave, and thus respondent would probably not be prevented from relying in good faith on that act as constituting good cause for a discharge.

562

re-employment—even if not absolutely barred she would hardly be "entitled" to it.

The question therefore becomes whether the order satisfies the alternative requirement of a remedial measure: the depriving of respondent of an advantage gained in violation of the Act. Ceteris paribus an employer gains no advantage from losing an experienced employee and here the only basis for finding that the employer desired the separation is by inference from respondent's attitude toward unionization and Mrs. Barron's known pro-union proclivity. The conclusion that there was no constructive discharge was based on the finding that respondent at least did not deliberately cause the separation to occur and there is no evidence of respondent's attitude at a later date since no voluntary reinstatement was requested. There is thus no indication whatever that respondent wanted Mrs. Barron's resignation and no basis for assuming that her quitting was an advantage to respondent.

The advantage that respondent sought and gained from its illegal conduct was that the union by a close vote lost the election, evidently due to the defection, under pressure, of a number of the employees. Had that election been protested the Board could have entered an appropriate order to dissipate the effects of the 8(a) (1) violations. Similarly unfair labor practice charges could have been preferred against respondent for the 8(a) (1) violations relating to Mrs. Barron while she was still employed, and an appropriate order could have saved her from the further pressure that may have contributed to her resignation.

It seems clear that this action by the Board was punitive rather than remedial and was therefore not permissible.

The petition for enforcement will be denied as to the reinstatement of Mrs. Barron, but will be granted as to the section 8(a) (1) violations.