**KEN–LEE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 19311.

United States Court of Appeals
Fifth Circuit.

Dec. 20, 1962.

Rehearing Denied Feb. 11, 1963.

Frank A. Constangy and Constangy & Prowell, Atlanta, Ga., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Margaret M. Farmer, Atty., N. L. R. B., Washington, D. C., Stuart Rothman, General Counsel, Allison W. Brown, Jr., Attorney, National Labor Relations Board, for respondent.

Before TUTTLE, Chief Judge, WISDOM, Circuit Judge, and JOHNSON, District Judge.

JOHNSON, District Judge.

This case is now before the Court upon the petition of Ken-Lee, Inc., seeking to have this Court review and set aside an order of the National Labor Relations Board issued against petitioner Ken-Lee, Inc., on October 30, 1961, pursuant to § 10(c) of the National Labor Relations Act as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.). The Board, in answer to the petition, seeks to have this Court order enforcement of its order which found that the petitioner violated § 8(a) (1) of the Act by threatening, unlawfully intimidating, and engaging in proscribed surveillance of its employees with respect to their union activity. The Board further found that the petitioner violated § 8(a) (3) and (1) of the Act by discharging employee Richardson and by laying off and failing to recall employees Carey and Massey, and by laying off and delaying the recall of employees Sims, Glass, Berry, Roberson, Pittman, Long and Lake.

The petitioner, Ken-Lee, Inc., is a garment contractor, with its principal office

and plant in Atlanta, Georgia, and with a small auxiliary plant in Greenville, Georgia. The business was founded in 1956 by its present president, principal stockholder and manager, Kenneth Jackson. In the summer of 1959, as a result of favorable business conditions, plans were commenced to open the auxiliary plant. In November 1959, the International Ladies Garment Workers Union began an organizational campaign among petitioner's employees. The usual preliminary union activities were engaged in, with the meetings being held, an organizing committee being selected, employees being solicited, and a number of application cards being secured. This solicitation and union activity came to the immediate attention of Jackson and petitioner's other officers. Jackson made his awareness of these union activities known to the employees in various ways. For instance, about November 10, Jackson approached employee Massey, who was a member of the union organizing committee, while she was at work at her machine, and asked her whether anyone had been bothering her about "this union thing." He later asked her whether she liked her job and stated that if she did she had "better talk to the girls." On December 11, Jackson summoned employees Richardson and Harper—both of whom were members of the organizing committee—to his office and told them he had heard they were ringleaders in organizing the union and stated that he would not have the union in the shop. The union began picketing the plant on December 14, and on December 18 Jackson assembled his employees, read them a prepared speech in which he spoke strongly against the union, and warned them that its entrance into the plant might make it impossible for the company to continue the operation of the plant. In the meantime (still in December, 1959), Jackson made an agreement with the Greenville, Georgia, Industrial Commission to open a pilot plant in the City of Greenville, Georgia. The plant was opened on January 6, 1960, with all white operators as contrasted with the Atlanta plant, which was staffed mostly by Negro operators. A transfer of work and machines from Atlanta to Greenville was commenced almost immediately. Meanwhile, Jackson continued to interrogate his Atlanta employees with respect to their union activity and threatened to close the Atlanta plant if the union was successful in coming in. An election was held in March of 1960. Shortly prior thereto, Jackson advised certain of his employees that if they voted for the union to represent them he would close the plant and move the machines out.

During the three-week period between the notice of the election and the holding of the election on March 10, 1960, Jackson laid off employees Sims, Glass, Berry, Roberson, Pittman, Carey and Massey, all of whom had been engaged in union activities, with the exception of Carey. Jackson advised these employees that work was slow and that they would be recalled when needed. During the same period, Jackson discharged employee Richardson, whom he had earlier accused of being a ringleader in the organizational activity. The night before the day of the election, Jackson paid an antiunion employee $10 to attend a union banquet. On the same evening, this employee reported to Mrs. Jackson the names of the employees who attended the banquet. This knowledge was made known to certain of the employees by comments from Jackson and other supervisory personnel, such as, "you went out and sold your job for a chicken dinner" and "the Union bribed you with a dinner last night but won't feed you next week."

The election resulted in an original vote of 66 to 59 against the union. The ballots cast by Richardson, Berry, Long, Massey, Glass, Roberson, Pittman, Sims and Carey were challenged and impounded, pending a decision on the validity of the challenges. Subsequent to the election and between March 14 and April 19, 1960, petitioner hired 19 employees, none of whom were of the group that had been laid off or discharged during the period

immediately prior to the election. Petitioner did recall by May 23, 1960, all the laid-off employees with the exception of Richardson, Massey and Carey.[1]

The Board found that the petitioner had threatened and coercively interrogated its employees with respect to their union activities and membership and had engaged in surveillance of union activities, all in violation of § 8(a) (1) of the Act. The Board further concluded that the petitioner had discharged employee Richardson because of her union membership and activity, thus violating § 8 (a) (3) and (1) of the Act; that the petitioner laid off Sims, Pittman, Roberson, Glass, Berry, Long, Lake, Massey and Carey because of its belief in their union membership and activity, thus violating § 8(a) (3) and (1) of the Act. The Board's order requires the petitioner to cease and desist from engaging in the unfair labor practices found; and, further, affirmatively requires the petitioner to offer reinstatement to and make whole employees Richardson, Massey, Carey, Sims, Glass, Berry, Pittman, Roberson, Long and Lake; and, further, to make available to the Board data necessary for the computation of back pay; and to post appropriate notices.

■ With the principles of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), in mind, this Court concludes that substantial evidence supports the findings of the Board that petitioner interfered with, restrained and coerced its employees in violation of § 8(a) (1) of the Act. The evidence heretofore referred to by this Court relating to the interrogations, threats and coercive statements, constitutes clear violations of § 8(a) (1). N. L. R. B. v. Coats & Clark, Inc., 241 F.2d 556 (5th Cir.); N. L. R. B. v. Fox Manufacturing Company, 238 F.2d 211 (5th Cir.); Stokely Foods, Inc. v. N. L. R. B., 193 F.2d 736 (5th Cir.); N. L. R. B. v. Sunnyland Packing Co., 211 F.2d 923 (5th Cir.); and N. L. R. B. v. East Texas Steel Castings Co., 211 F.2d 813 (5th Cir.).

■ The determination of the question concerning whether the Board properly found that the petitioner discharged employee Richardson and laid off and delayed the recall of or refused to recall employees Sims, Glass, Berry, Roberson, Pittman, Carey, Massey, Long and Lake, thus violating § 8(a) (3) and (1) of the Act requires a further summarization of the evidence. There is no question but that Jackson and the other supervisory employees of the petitioner knew the names of the employees who attended the banquet the night before the election.[2] As to the discharged employee Richardson, the evidence reflects that Jackson had been aware, for a long period prior to the election, that Richardson was instrumental in organizing his plant. He not only accused her of being the ringleader in the union movement in December 1959, but warned her that the plant would close if the union "got in." On Friday,

---

1. The complaint in this case was filed on Friday, May 6, 1960.

2. The testimony of antiunion employee Lee in this connection was:
"Q (By Mr. MacCarthy) Did Mr. Jackson say anything to you afterwards, personally?
"A Yes. He asked me would I go to the banquet.
"Q Did you go?
"A Yes, I went—and he gave me $10.-00 for going, to tell who all the people were there.
"Q Tell me what happened after you went to the banquet.
"A I was supposed to have gone to the bar.
"Q Who told you to go to the bar?
"A Mr. Jackson, so I could see everybody, you know, going into the banquet. But when I got there, the bar was closed, so I called him and told him it was closed. So he told me, if I could get inside the banquet, to go in; and I did.
"When I got home that evening, Mrs. Jackson called me on the phone and asked me who all was there.
"Q Did you tell her who they were?
"A Yes, I did.
"Q Who you knew or saw over there?
"A Yes, I did."

March 4, Richardson was absent with permission; yet when she returned on the following Monday, she was not permitted to check in, but was told by Jackson to go home and return on Thursday, March 10. When she returned as instructed, Jackson handed her a separation notice, with the cause of separation being that she had been absent for one-half day and that she had a poor attendance record. The testimony concerning Richardson's attendance record was conflicting. However, the summary payroll sheets for the pertinent periods, together with all the pertinent circumstances relating to Richardson's employment, warranted the Board in concluding that her absence(s) was not, in fact, the cause, but merely a conveniently used pretext for her discharge. The Board was justified in rejecting the petitioner's claims with respect to the discharge of Richardson and was fully justified in finding and concluding that her discharge was motivated by a determination to weaken the union in the plant. Therefore, we conclude that substantial evidence supports the finding of the Board that the petitioner discharged employee Richardson because of her union membership and activity, thus violating § 8(a) (3) and (1) of the Act.

As to the other nine employees who were laid off, the evidence reflects that they were among those questioned by Jackson during the critical period prior to the election of March 10, 1960, concerning union activities in general and their participation in its activities in particular. For instance, Jackson interrogated Massey about the union early in November and suggested that if she liked her job, she had better "talk to the girls." Massey had attended the organization committee meeting and the banquet. He told Carey, who also attended the banquet, that she would be in the plant a long time if she did not "play politics" and if she would "quit listening to politics." He told Berry, another banquet attender, that he had heard she had joined the union. He told Long that he would hold her mortgage application for a few days to see "how you girls act toward the union." Glass, Lake, Roberson, Pittman and Sims had all signed union authorization cards, attended organizational meetings and the union banquet. Although Jackson testified that the layoffs were not in any way connected with the union activity and/or membership of the employees affected, his testimony failed to explain the bases of the selection of the nine employees herein involved. These nine employees were told either that work was slow and that they would be recalled when business improved, or that there was no work for them at that time. The evidence in the record, however, indicates that early in January of 1960 petitioner opened a new plant at Greenville, Georgia, staffed it with new employees, and began to transfer work and machines to the new plant. During the same period and on February 16, petitioner advised his assembled employees that an alternate plant was being set up so other facilities would be available in the event of a labor disturbance at the Atlanta plant. Thus the Board was fully warranted in finding and concluding that Jackson knew of or believed in the union membership and union activity of the group laid off and based his actions on his knowledge and belief. Substantial evidence supports the finding of the Board that petitioner laid off and delayed the recall of or refused to recall these nine employees in order to weaken the union in the Atlanta plant, thus violating § 8(a) (3) and (1) of the Act.

For the foregoing reasons, the petition to review, wherein it seeks to have this Court reverse or modify the order of the Board, is denied; said order is

Enforced.