**BREWTON FASHIONS, INC.**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

**UNITED GARMENT WORKERS OF AMERICA, LOCAL UNION NO. 422**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

**NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**UNITED GARMENT WORKERS OF AMERICA, LOCAL UNION NO. 422**, Respondent.

Nos. 21054, 21144, 21150.

United States Court of Appeals
Fifth Circuit.

May 10, 1966.

---

C. Vaughn Stelzenmuller, Mark L. Taliaferro, Birmingham, Ala., Leon G. Brooks, Brewton, Ala., Weil, Gotshal & Manges, New York City, Moore, Thomas, Taliaferro, Forman & Burr, Bir-

mingham, Ala., for Brewton Fashions, Inc., Robert Todd Lang, Marshall C. Berger, William J. Abelow, New York City, of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, William J. Avrutis, Atty., Arnold Ordman, Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., for National Labor Relations Board.

Robert A. Wilson, Cincinnati, Ohio, for United Garment Workers.

Before JONES and THORNBERRY, Circuit Judges, and SLOAN, District Judge.

THORNBERRY, Circuit Judge:

Petitioners Brewton Fashions, Inc. (the Company) and United Garment Workers of America, Local Union No. 422 (the UGW) seek review of the decision and order of the National Labor Relations Board. The Board has filed a cross-petition requesting enforcement of its order.

The Company is a subsidiary of Judy Bond, Inc., a corporation which sells blouses. Prior to 1962, practically all of the Judy Bond blouses had been made by certain contractor firms in New York organized by the International Ladies Garment Workers' Union (the ILG) under a master contract with the National Association of Blouse Manufacturers, of which Judy Bond was a member. In the fall of 1961, Judy Bond resigned from the Association and began dealing with the ILG separately. A labor dispute resulted when the parties could not agree.

On December 14, 1961, the Company was formed as a subsidiary of Judy Bond to manufacture blouses and contracted to purchase Brewton Manufacturing Co., Inc., which had been engaged in the production of men's shirts at Brewton, Alabama. Since warehouse facilities were unavailable at that time in Brewton, the Company leased a building in Birmingham for a period of one year.

The UGW had been the certified bargaining representative of the employees of Brewton Manufacturing Co. since 1957. The Company negotiated a new contract with the UGW on January 10–11, 1962, recognizing the UGW as sole bargaining agent of "all employees in the plant in Brewton, Alabama, and in the temporary warehouse at Birmingham, Alabama * * *" except maintenance and supervisory employees.

The ILG objected to Judy Bond's change in operation. As described by the trial examiner:

"It is not disputed that ILG regarded the Brewton and Birmingham operation of Judy Bond as a 'runaway shop' and took certain action designed to compel Judy Bond to agree to its demands. Such activity began at the Brewton plant the latter part of January or early February, with the distribution of leaflets at the plant entrances, and the mailing of copies of 'Justice,' the official organ of ILG, to employees of that plant. * * * This activity by ILG gave rise to considerable discussion among the employees. Thus, there was extensive discussion among the employees about the claim that Judy Bond was a runaway shop which would be required to move its operations back to New York, or to staff the Brewton plant with displaced employees from New York; that ILG would picket the Brewton plant; and that the Company would not install air conditioning or build the lunchroom, as it had promised when it announced the purchase of the plant

* * * * * *

"To gain adherents from among the employees in the Brewton plant, ILG maintained a group of organizers in the area during the entire relevant period. United [UGW], which had theretofore sent a representative into Brewton about once a month, thereaf-

ter kept one or more representatives in the area at all times to counter the activities by ILG."

The contract between the Company and the UGW was ratified by the employees in Brewton but not by the warehouse employees in Birmingham. The warehouse was a new facility and had not been served by the UGW. The Board found violations of section 8(a)(1) and (2) in the Company's recognition of the UGW as the exclusive bargaining representative of the employees at the Birmingham warehouse at a time when the UGW did not represent a majority of the employees and in the coercion of employees to accept the UGW as their bargaining representative.[1] The Company does not contest these findings on the merits; however, it asserts that the remedy and the order concerning the Birmingham facility are improper since the matter is now moot and since the order is not limited to the plant at which the practice occurred. Under the facts of this case and after a reading of the order, we conclude that these contentions are without merit. Cf. NLRB v. Mexia Textile Mills, 1950, 339 U.S. 563, 567, 70 S.Ct. 826, 828–829, 94 L.Ed. 1067.

### Supervisors

Before dealing with the principal issues of this case, we must first consider a preliminary question of whether certain employees should be classified as supervisors under the Act.[2] The Brewton plant has some 300 employees. James Byrd is the plant manager. Forelady Oleen Turner directs the laundry room's 55 employees, and Foreman Tommy Williams is in charge of 200 employees in the sewing room. The Company admits that these employees are supervisors. Foreman O. T. Eskridge supervises twelve employees in the cutting room. He has the authority to assign work and overtime and to move employees from one operation to another within his department, and he attends meetings of supervisory personnel. The sewing department has several sections, each with a floorlady in charge. The floorladies train new employees, give out work to the operators, assign them to specific machines, check garments for quality and workmanship, return defective work to the operators for repair, assign repair work to certain operators on an hourly rate rather than the normal piecework basis and prepare production reports on each employee under them. There is evidence that they may grant time off on their own responsibility. They see that their operators do their work and that they do not spend too much time in the restroom or talking. Floorladies are paid on an hourly rate designed to yield more than production work, do not operate machines, and attend production meetings. They assist Foreman Williams in enforcing Company rules. Williams testified that he gives

1. On January 3, 1962, (before negotiation on the new contract), the warehouse manager Kalamus called the eight warehouse employees into his office, introduced Mattie Jones, the UGW representative, and left the office. She explained the contract (apparently the old one with the Company's predecessor), told them that they were covered by the contract and asked them to sign dues deduction authorization cards. James Wyne refused to sign and left the room. Kalamus told him that if he did not join the union, "we can't keep you." Wyne returned to the room and told Mrs. Jones that "I didn't change my mind. Kalamus changed it for me." and signed a card. Kalamus later selected one employee to be in charge of signing up new employees for UGW and told him that if any refused he would straight-

en them out since he wanted all of the employees to be in the union. The ILG began picketing the warehouse on January 24, 1962, and was joined by all the employees. The warehouse was operated until December 14, 1962, apparently with replacements and then closed permanently.

2. 29 U.S.C. § 152(11):
The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

weight to their recommendations concerning employees under their supervision.

██ The Board found that Foreman Eskridge and the floor ladies are supervisors within the definition provided by the Act. The evidence shows that they have authority "responsibly to direct" employees under their supervision and "effectively to recommend" action to be taken with regard to such employees. Since their exercise of authority is more than of a "merely routine or clerical nature" and "requires the use of independent judgment," they were correctly found to be supervisors under the Act. See NLRB v. Southern Airways Co., 5th Cir. 1961, 290 F.2d 519; NLRB v. Mt. Clemens Metal Prods. Co., 6th Cir. 1961, 287 F.2d 790.

### Interrogation of Employees

On January 12, 1961, Plant Manager Byrd assembled the employees and informed them that Judy Bond had purchased the plant. The employees later approved the new contract with the Company by a virtually unanimous vote.

The Brewton plant continued to be governed by rules promulgated prior to the take-over by the Company. Among others, these rules prohibited organizational solicitation "on the Company's time during working hours," assault or threat of assault on fellow employees, loafing or unnecessary slowing down of work, and "wilfully discouraging new employees with the intent and purpose of having them leave the employ of the Company."[3]

3. Byrd became manager of the Brewton plant in September 1961. On October 11, 1961, he posted on the plant bulletin board a list of plant rules and the discipline to be imposed for violation of each rule. This list of rules, which remained posted during the entire period relevant here, set forth, *inter alia*, the following:

Notice is given to each employee of the adoption by the Company of the following plant rules. The Company requests compliance with these rules and gives notice to each employee that they will be strictly and justly enforced.

| Prohibition | Discipline |
|---|---|
| **Rule No.** | |
| 1. Employees shall not solicit membership or engage in organizational activities or any other activities of any organization on the company's time during working hours. | Three slip system shall apply. |
|      ＊   ＊   ＊   ＊   ＊   ＊ | ＊   ＊   ＊ |
| 3. Assault of fellow employees, brawling or fighting on company property, or any act or threat thereof. All parties entering into these acts shall receive the same punishment. | Minimum of 2 weeks' layoff to discharge for employees involved. |
|      ＊   ＊   ＊   ＊   ＊   ＊ | ＊   ＊   ＊ |
| 14. Loafing or unnecessary slowing down of work by any employee while on the job. | Three slip system shall apply. |
| 15. Wilfully discouraging new employees with the intent and purpose of having them leave the employ of the Company. | Discharge. |
|      ＊   ＊   ＊   ＊   ＊   ＊ | ＊   ＊   ＊ |

The above rules, so long as they are in effect, will be enforced by the Company, and any employee violating any of the rules will be subject to the penalties as stated above.

In the early part of February, Louise West was discussing the UGW and the ILG with a group of employees at lunch. Soon after lunch, she was called to Byrd's office and was told that he "would not have discussion about the Union in the plant at anytime." Later that day, West notified the UGW that she wished to resign from the union. On May 7, West signed an ILG card. Several days later, Byrd called her into his office, accused her of passing out ILG literature in the plant and warned her "if I catch you or hear of you talking about this any more in this plant, you will be terminated."

Byrd called employee Kate Jones to his office in early February and told her of rumors that she was working with the ILG. She denied it. On May 15, she signed an ILG card. The following day, Foreman Eskridge asked her if she had had "company last night," and she admitted that ILG representatives had visited her. About an hour later she was summoned to Byrd's office and informed of rumors that she was aiding the ILG.

In mid-April employee Ruth Bell told Byrd that she had heard rumors that the other women were going to put her out of the plant because she had withdrawn from the UGW. Byrd told her not to worry and asked if she knew anyone who had been talking to ILG representatives and specifically about Louise West and Kate Jones. He told her that he was planning to make her a supervisor and had referred to the ILG because he hoped she would not get involved since it would only mean trouble. Bell signed an ILG card on May 15. The next morning Floorlady Gandy asked if ILG representatives had seen her the preceding night, saying that Byrd suspected this and wanted to know for sure, and asked her if Foreman Eskridge was involved with the ILG. Four days later Byrd told Bell that he had heard she had been soliciting during working hours and that she would be discharged if he caught her doing so on company time or property.

Employees Kathleen Chavers, Lynn Estes, Orette McCall, Ruth Johnson and Fay Madden were similarly interrogated by Byrd or other supervisory personnel before and after signing ILG cards. Byrd told Estes that bringing a copy of the ILG newspaper into the plant was a form of soliciting and that he could not carry a copy in his pocket. Byrd asked McCall if she preferred working five days a week rather than three or four and told her that if the new union came in, the Company would have to take the work back to New York.

The Board found these conversations to be violative of section 8(a) (1) of the Act. The evidence of threats of reprisal, promise of reward, close surveillance of employee activity outside the plant and attempts to induce employees to inform on their fellow employees is more than adequate to uphold these findings of the Board. NLRB v. Great Atl. & Pac. Tea Co., 5th Cir. 1965, 346 F.2d 936, 938; NLRB v. Camco, Inc., 5th Cir. 1965, 340 F.2d 803, 804–807 & n. 6.

### Eviction of ILG Supporters

On May 22, the rule against solicitation was changed from the former prohibition against such activity "on the Company's time during working hours" to one prohibiting solicitation at any time on the Company's property.[4]

Fay Madden and Lynn Estes reported to work on May 23 wearing ILG pins. While other employees held Madden, Ann Wilson took her pin and threw it away. Madden got another, and Ann Wilson tore it from her dress. Foreman Eskridge and Floorlady Gandy observed this incident but did nothing. Byrd told Madden that she "didn't have any right to wear that button" in the plant and sent her home so the other women could cool

---

4. At *no time* shall anyone be permitted to solicit membership or engage in organizational activities or any other activities of any organization on the Company's property. (Emphasis in original.)

off. No action was taken against Ann Wilson or any of the other women involved. Madden was told she could return that afternoon. A little later Byrd called Estes in, told him that wearing a pin was a form of solicitation and that if he wore it again he would be fired.

After these incidents, Millard Rothenberg, Vice President of Judy Bond, spoke to the employees over the public address system. He told them that the ILG "does not belong here and we will not tolerate any action which might create dissension and disturbances in this plant. We are very gratified by the loyalty most of you have shown to the Company and we hope that this relationship will continue for a long, long time."[5]

Later that afternoon, Frank Braddick picked up an iron bar, told Estes that "you are going to get hell out of here and you won't come back if you know what's good for you" and, with the assistance of four other employees, marched Estes out of the plant. At the same time a group of women forced Louise West, Kate Jones, Ruth Bell and Kathleen Chavers out of the plant. Among these women were Mary Braddick (Frank's wife), Ann Wilson and Bessie West. Just before this activity, Floorlady Gandy told Floorladies Johns and Smith to come with her to Foreman Williams' office. During the eviction, Floorlady Gandy peeked out the door and "giggled."

The four evicted women went to Byrd, told him of their expulsion and of those responsible and asked him to make the other employees leave them alone. He replied, "No, I can't handle them * * * that's what you call a mob * * *. [Y]ou can come back if you want to (tomorrow), but it will be at your own risk because I'm not going to give you any kind of protection in the plant; I can't." They were advised to go home and stay there until he notified them to return.

The next day the group was advised not to come to work. On the following day, they all came to Byrd's office. Byrd said he could offer them "no protection unless there is violence in the mill. * * *" Estes and Madden were told to stay after the others left. Estes was discharged for wearing a pin on the afternoon of May 23 after he had been warned not to do so. Estes denied wearing the pin. Madden was given her third slip for failing to meet production and was discharged.

On May 30 a notice was posted advising employees that there was to be no violence on Company property. Later that day West, Bell, Jones and Chavers went to Byrd's office seeking to return to work.[6] Foreman Eskridge attempted to

5. ADDRESS MADE BY MILLARD ROTHENBERG IN BREWTON PLANT
May 23, 1962
This is Millard Rothenberg speaking—I would like you to know how pleased we are with the progress you have made. Both your production and quality levels have shown steady increases. We are positive that within the next few months your earnings will reach a higher level and that the plant will become profitable for Judy Bond.
We are going to make this plant a place that you, the Company and the city of Brewton can be proud of. We are happy to announce that the entire plant will be air conditioned within 30 to 60 days. In addition, the lighting in the plant will be doubled and the lunchroom should be completed very shortly. We expect that within four months our new distribution center will be completed and in operation.

In case there is any doubt in any of your minds, Judy Bond is here to stay. We intend to carry out all of the provisions of our three year contract and expect that you will do the same. We have no intention of permitting the I.L.G.W.U. to interfere illegally with our agreement. The I.L.G.W.U. does not belong here and we will not tolerate any action which might create dissension and disturbances in this plant.
We are very gratified by the loyalty most of you have shown to the Company and we hope that this relationship will continue for a long, long time.

6. Byrd said West and Bell would be assigned to sewing machines instead of their former work as service girls since that would give them less contact with other employees. Both protested but were told that they would be discharged unless they took the new positions.

escort Jones and Chavers to their jobs, but some 25 women forced them out the door. Mary Braddick and Ann Wilson were among these women. Eskridge returned to Byrd's office and informed him that "they are running Kate [Jones] and Kathleen [Chavers] out again and Mary Alice Braddick started every darn bit of it." All four women then left the plant after Byrd sent the other employees back to work. No action was taken against any of the employees involved in the expulsion; however, Mary Braddick was later promoted to floorlady and her husband Frank elevated to a cutter.

On June 4 the women wrote Byrd, expressing a desire to return to work. Byrd did not answer until June 25. West and Bell were informed that they had "intentionally and wilfully provoked" the demonstrations which had been directed against them and that if they wished to work, they would have "to avoid the inciting of any further demonstrations." After consultation, it was agreed that they could return on July 9, following the end of a plant vacation. There was no trouble on July 9 and 10, but on July 11 the women were again driven out of the plant by a group apparently led by Louise Lundi. Eskridge took Bell, Jones and Chavers to Byrd and told him that they "had not done anything to cause the difficulty." Byrd asked for names of those responsible and told the women to stay home until he notified them. None of the women were ever notified by Byrd.

On Friday, July 27, a group of employees, including Ann Wilson, Louise Lundi and Bessie West, told Carolyn Grey that unless she gave them her ILG card she could not come to work the following Monday. Monday, Grey refused to give up her card but Lundi and Wilson decided to give her a little more time. Grey complained, and Byrd assured her that she would not be put out.

On August 3, Grey, Orette McCall, Doris Odum and Ruth Johnson came to work wearing ILG pins. Byrd called them in and said they could not wear the pins. They went home but returned the next working day to go to work. Byrd told them not to wear pins and promised to talk to the floorladies to get them to protect them. That afternoon a group of women, among whom were Louise Lundi, Ann Wilson and Bessie West, ran them out of the plant while the floorladies looked on "snickering." Byrd told them that their presence was causing the disturbance and that he could not fire 300 people for their protection. Byrd never informed any of them that they could return to work.

On behalf of the Company, Byrd testified that he had made a thorough investigation of each of the incidents but was never able to isolate the responsible individuals and therefore could take no disciplinary action other than a group reprimand. Of the seven employees called by the Company, five of whom Byrd claimed to have interrogated, six testified that neither Byrd nor any other supervisory personnel ever questioned them about the incidents or reprimanded them for participating. Byrd also testified that production dropped about 40 percent below normal during the period of disturbance. The hearing examiner, however, noted that this testimony was in direct conflict with the statement of Rothenberg in his May 23 speech to the plant employees commending them on the "steady increases" shown in "production and quality levels."[7] Although the examiner warned the Company that it was "taking certain risks" by failing to substantiate its claims by offering the production records as evidence, the Company did not do so. The examiner concluded that there had been no substantial effect on production.

The Board found the Company's acquiescence in the expulsion of employees belonging to the ILG by members of the UGW to be a violation of section 8(a)(3). The Examiner went somewhat further in concluding that "the Act im-

---

7. See note 5, supra.

poses an affirmative duty upon an employer to insure that his obligation to maintain discipline in the plant and to provide his employees with the opportunity to work without interference from their coworkers, is not delegated or surrendered to any union or anti-union group. * * * " We do not have to go this far for the evidence shows that the Company did more than merely acquiesce or fail to act—it encouraged the activity. After the first act of violence in the plant (the assault of Fay Madden), the Vice President of the parent company spoke to all the employees. Instead of condemning the violence, he stated that the ILG "does not belong here" and that he was "gratified by the loyalty of most of you." These remarks could only indicate that the Company approved of the acts of its employees in ridding the plant of ILG sympathizers. After each incident, the evicted employees were the ones who were criticized and sent home by the plant manager and eventually "laid off" on a permanent basis. The supervisors mysteriously disappeared from the scene a few minutes before an incident or stood by without making any attempt to halt or prevent the violence. Although Plant Manager Byrd claimed he had thoroughly investigated the incidents, five of the six employees supposedly interrogated by Byrd testified that they had neither been questioned nor reprimanded. Indeed, two of the chief instigators of the violence were given promotions even though the Company had been informed of their part in the expulsions. Thus it is evident that the Company not only failed to take adequate steps to prevent violence to supporters of the ILG but also that it actively encouraged such actions. For these reasons, the Board's finding was clearly proper. NLRB v. Newton, 5th Cir. 1954, 214 F.2d 472, 475; NLRB v. Fred P. Weissman Co., 6th Cir. 1948, 170 F.2d 952, 954, cert. denied, 336 U.S. 972; 69 S.Ct. 942, 93 L.Ed. 1122; NLRB v. Goodyear Tire & Rubber Co., 5th Cir. 1942, 129 F.2d 661, 664, cert. denied, 319 U.S. 776, 63 S.Ct. 1026, 87 L.Ed. 1723;[8] NLRB v. Hudson Motor Car Co., 6th Cir. 1942, 128 F.2d 528, 533.

### No Solicitation Rule

The Board concluded that there was "no justification" for the modification of the solicitation rule to prohibit solicitation at any time on Company property. The original rule had only forbidden solicitation on Company time during working hours and had been in effect several months prior to the purchase of the Brewton plant by the Company. The change was promulgated at a time when ILG activity in signing up employees was "at its height."[9]

In Republic Aviation Corp. v. NLRB, 1945, 324 U.S. 793, 803, 65 S.Ct. 982, 988, 89 L.Ed. 1372, the Supreme Court approved the following statement of the test to be applied to such solicitation rules:

"Working time is for work. It is therefore within the province of an em-

---

8. In *Goodyear Tire*, this Court dealt with a similar situation and stated:

"[I]t is not denied by respondent, indeed it puts forward as a defense, that the 12 were evicted because of their membership in or sympathy with United, as a result of the demands of other employees that they be evicted. Difficult as an employer's position may be under such circumstances, its duty is plain. The statute prohibits discrimination against persons on account of their membership in or activities on behalf of unions. It specifically prohibits the discharge of employees for the purpose and with the effect of discouraging membership in a union. On the admitted facts respondent cannot escape responsibility for these evictions and discharges. * * * [T]hese discharges were the result of the feeling against United then rampant in the plant and community, and, to say the least of it, yielded to by respondent. It was its duty to resist such violent domination of its right and power to employ whether manifested by or toward United. It cannot escape responsibility for the consequences of its failure to discharge that duty."

9. Nine of the ten ILG adherents involved in this case signed ILG cards between May 7 and May 21. The rule was changed on May 22.

ployer to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. It is no less true that time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. *It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property. Such a rule must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline.* (Emphasis added.)

See NLRB v. United Aircraft Corp., Pratt & Witney Aircraft Division, 2d Cir. 1963, 324 F.2d 128; NLRB v. Linda Jo Shoe Co., 5th Cir. 1962, 307 F.2d 355.

■ The Company attempts to establish the "special circumstances" necessary to justify the rule by pointing to the "tense plant situation" and the violent incidents which followed the promulgation of the rule. Since we have concluded that the Company played a major role in fostering and encouraging this atmosphere of tension and the resulting violence, we cannot allow the Company to utilize the results of its own unlawful acts to justify this restriction on union activity. The background of the Company's anti-ILG sentiment and the timing of the rule's modification at the height of ILG activity indicate that the Company had motives other than maintenance of production or discipline. This conclusion is further strengthened by the complete failure of the Company to utilize its already established methods for insuring production and discipline. Thus the Company has failed to sustain its burden of justifying the rule in the face of its presumed invalidity.

### Prohibition of the Wearing of ILG Pins

■■ Similar considerations apply to the Company's refusal to allow employees to wear ILG pins on Company premises. "[T]he right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of union activity * * *" under Section 7 of the Act. Republic Aviation Corp. v. NLRB, supra, 324 U.S. at 802 n. 7, 65 S. Ct. at 987, 89 L.Ed. at 1379; see NLRB v. Mayrath Co., 7th Cir. 1963, 319 F.2d 424, 426; NLRB v. Floridan Hotel, 5th Cir. 1963, 318 F.2d 545, 547. The right, however, may be restricted in the interests of insuring "efficient and orderly operation" of a company's business. *Floridan Hotel,* supra. If the Company in the instant case had taken a neutral position in the inter-union controversy and had taken reasonable steps to enforce its pre-existing rules for maintaining production and discipline, its action in prohibiting the wearing of union pins may have been justified. But, in the context of events as noted above, the Board properly found the prohibition and the discharge of Lynn Estes for wearing a pin to be violations of the Act.

### Discharge of Fay Madden

■ Fay Madden was hired on March 29 as a presser, mainly on the recommendation of Byrd's friend, the Mayor of Brewton, even though she had failed the employee aptitude test. One week later (April 5) she received a warning notice for "lack of efficiency." On May 15 she joined the UGW and on May 17 the ILG. About a day later, Floorlady Cain asked her if she did not "have enough sense not to join another union" and told her that if the "other union came in" "a lot of youngsters would go hungry." Madden received a second notice on May 21, more than six weeks after the first notice, for failure to make production and was warned that unless she made production by May 23 she would receive her third slip and be fired. UGW shop steward Jessie Wilson, who was present in Byrd's office when Madden was given the second slip, later told Madden that the

18

Company would take the slip back if she withdrew from the ILG. That afternoon Floorlady Cain asked Madden if she was still in the ILG. When Madden replied that she understood union matters were not to be discussed on company time, Cain stated that she thought Madden had to work, but perhaps she did not. On May 23, Madden wore an ILG pin to work. After pins were twice ripped off her dress, Byrd sent her home. The next day Byrd discharged Lynn Estes for wearing an ILG pin and Madden for failure to make production.

> "We have repeatedly held that 'if the discharge is because of union activity it is a violation of the Act even though a valid ground for dismissal might exist.' * * * [W]here 'there are two grounds for discharge, one proper and the other unlawful, and the evidence as a whole would make the inferences as to which was the motivating cause reasonably equal, the conclusion reached by the Board should be sustained.' N.L.R.B. v. Hudson Pulp & Paper Corp., 273 F.2d 660, 666 (5th Cir. 1960); N.L.R.B. v. The Newton Co., 236 F.2d 438, 445 (5th Cir. 1956); N.L.R.B. v. Fox Mfg. Co., 238 F.2d 211, 215 (5th Cir. 1956)."

NLRB v. Longhorn Transfer Serv., Inc., 5th Cir. 1965, 346 F.2d 1003, 1006. From the long delay between the first and second notices, the nature of Madden's activity immediately preceding the second and third notices, the comments of supervisory personnel and the timing of the discharge during a period of intense union activity,[10] the Board concluded that the discharge was motivated by Madden's union activity. Since this finding is based upon a reasonable inference and is amply supported by evidence in the record, we sustain the Board's finding.

The Company strenuously asserts that the Hearing Examiner was biased; however, the Company fails to present sufficient evidence to support this contention.

The order of the Board is enforced.

---

10. See NLRB v. Soft Water Laundry, Inc., 5th Cir. 1965, 346 F.2d 930, 935: "The timing of the discharge is also pertinent evidence of motivation."