### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### HUDSON PULP & PAPER CORPORATION and Pioneer Transportation Service, Inc., Respondents.

#### No. 17703.

United States Court of Appeals
Fifth Circuit.
Jan. 12, 1960.

Alfred Brummel, Atty., National Labor Relations Bd., Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, National Labor Relations Bd., Frederick U. Reel, Fred J. Hahn, Attys., National Labor Relations Bd., Washington, D. C., for petitioner.

Theo. Hamilton, Jacksonville, Fla., for respondents.

Before HUTCHESON, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

The National Labor Relations Board has petitioned for enforcement of its order against the respondents, Hudson Pulp & Paper Corporation, herein called Hudson, and Pioneer Transportation Service, Inc., herein referred to as Pioneer, directing the respondents to cease and to desist from specified anti-union activities, to rehire a discharged employee of Pioneer, and to post a compliance notice. Hudson is a manufacturer of paper and related products at a number of plants, one of which is at Palatka, Florida. Pioneer furnished trucks and drivers to Hudson at Palatka for transportation of its products. Pioneer was managed, primarily, by Irving Weinstein, who apparently was the principal owner of its stock. He hired the drivers and supervised their work. The drivers were on Hudson's payroll and received hospitalization insurance and an annual bonus from Pioneer. The Palatka mill was unionized except for the truck drivers. Weinstein had formerly operated in Pennsylvania and New York, and his drivers there were represented by a union. In September of 1956 some of the truck drivers attempted to get union representation. At their request, a union representative in Jacksonville first requested Pioneer and later Hudson to bargain with the union as representing the drivers. Hudson declined to bargain without certification. An election was held on December 6, 1956, and the union failed to get a majority.

During the period of the union effort to obtain recognition, Weinstein had attempted to learn the identity of the drivers who had signed union authorization cards, had made inquiries as to the union wage rate for drivers, and had stated that before he would let the union in he would sell the trucks and the drivers could starve as far as he was concerned. Before the election the Industrial Relations Director of Hudson talked with one of the drivers, a member of the union, and made inquiry as to who was for the union. He was given a non-committal answer and closed the interview by slapping the driver on the back and saying, "Well, I hope you boys luck." The Industrial Director talked with another driver and asked why the drivers wanted a union. The Board found interference, restraint and coercion of the drivers in violation of Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1). So far as Pioneer is concerned, we think that there is a sufficiency, although not overmuch, of evidence to sustain the findings. As to Hudson, we would reach a contrary conclusion unless Pioneer, which was controlled and managed by Weinstein, acted for Hudson in the employer-employee relations with the drivers. Weinstein, subject to Hudson's veto power, did the hiring and the firing, directed the work of the drivers and, as the Board found, "In practical effect, Hudson thus designated Pioneer (acting through Weinstein) to act as its agent.

with respect to the operation of the leased equipment and the hiring, discharging and supervision of its driver employees." 121 N.L.R.B. 1446, 1450. Pioneer was acting for Hudson. The cease and desist portion of the Board's order will be enforced. See National Labor Relations Board v. McGahey, 5 Cir., 1956, 233 F.2d 406; National Labor Relations Board v. Newton Co., 5 Cir., 1956, 236 F.2d 438.

One of the drivers at Hudson's Palatka mill was Enon M. Harris. He had been employed, off and on, by Pioneer in Pennsylvania during the period between 1935 and 1947. In December of 1947 he moved to Florida at Weinstein's request and became a driver for Hudson and Pioneer. He was one of the drivers who had attempted to procure union recognition. He had been a participant in a similar attempt made about three years earlier. His difficulties with his employer to which our attention is directed seem to have commenced in October, 1956. Weinstein was on vacation. William Miles Baker, a Hudson employee, had the responsibility for the time being of authorizing repairs to the truck equipment. Harris was driving a truck from Chicago to Palatka. Mechanical trouble developed. He telephoned, as he was required to do, for authority to incur the repair expense. There was a delay in reaching Baker by telephone and getting authority to have the repairs made. Harris borrowed $40 from the garage making the repairs to cover his expense during his layover, and the garage added this to the repair bill sent to Pioneer. Weinstein charged the $40 back to Harris. Harris quoted Weinstein as saying, "Any time that a truck breaks down, you don't have it fixed, you run the thing until it falls apart and then get in the best way you can." Despite the vigorous denial of Weinstein that any such statement was made, and despite the implausibility of a statement that the owner of valuable equipment had directed an employee deliberately to damage it, the Board credited the testimony of Harris.

In December of 1956, Harris was driving a truck from Milwaukee to Palatka. In Tennessee, engine trouble developed. As Harris stated it, "The counterbalance had worked loose on the crankshaft and was causing vibration, undue vibration." "And", testified Harris, "if it got too bad it could tear up the truck, tear up the motor." Harris admitted that he knew better than to drive the truck in its state of disrepair. He drove it on to Palatka, a trip of about eighteen hours. Harris gave two reasons for his failure to have the truck repaired, first, that he didn't have enough money with him to wait until repairs were made, and second, the orders he had received "to bring it in." On arriving at the Palatka mill about ten or eleven o'clock at night Harris parked the truck. Harris had been instructed that if a truck needed repairs he should leave a note affixed to the key stating that fact. Harris deliberately failed to do this although he was aware of the condition that, in his words, might "tear up the truck, tear up the motor." He sought to excuse this willful disobedience of orders by saying that on other occasions he had "left written notes on the key and the work wasn't done on them anyhow." The next morning Harris went to the mill to pick up his expense check. The truck which Harris had brought in the night before passed him on the road as he was on his way to the Hudson mill, and he assumed it was going to Chicago. He made no effort to detain it. After Harris had obtained his expense check he saw Weinstein and told him the truck needed repairs. Weinstein replied, "It is too late now. It's gone." This was not news to Harris. Harris was later informed that what he had predicted might happen, had happened; that the truck required the installation of a new motor before it returned from the trip which was beginning when it passed Harris on the road. There was evidence that on other occasions Harris had been responsible for damaging equipment. Weinstein discharged Harris on January 15, effective January 19, 1957, and the reason given

for the discharge was "tearing up" equipment. On the complaint of Harris the Board found that he had been discharged because of his union activities and ordered that he be given back pay and offered reemployment.

The only evidence of any anti-union animus directed toward Harris by his employer to which our attention is called is to be found in the testimony of George W. Miles, a brother-in-law of Harris. Like Harris, he was a truck driver in the employ of Hudson and Pioneer. Miles, as a witness called by the Board's General Counsel, testified on direct examination about two conversations with Weinstein. He was asked about the first of the conversations, and so far as might have related to Harris the questions and answers were:

"Q. Will you tell us now what was said during this conversation pertaining to the union, union subject, anyway? A. All he said to me, he said he didn't know what he was going to do with Enon.

"Q. Just tell us the full conversation, what was said at that time. A. You kind of got me a little—

"Q. You don't have to say the exact words, but the context of it, the substance of what was said between you and Mr. Weinstein on that occasion pertaining to the union or unionization of the truck drivers. A. I don't exactly remember.

"Q. You said this conversation took place the day before he left for California? A. It was on—I believe it was.

"Q. You said there was a conversation pertaining to the union. Can you tell us in substance what the conversation consisted of? A. Mostly Mr. Harris, I guess it was.

"Q. What was said in substance about Mr. Harris in relation to the union? A. He told me, he said he didn't know what he was going to do with Mr. Harris. Of course, I don't do much talking nohow, and so—

"Q. In what way was the subject of Mr. Harris related to the union, Mr. Miles? A. I reckon because he was the one that started it.

"Q. What was said in that connection? A. (No response.)

"Q. Can you recall? Do you have any recollection at this time of that conversation, Mr. Miles? A. No, I don't exactly remember it, what it was."

Later, following examination having no relation to Harris, counsel for the Board resumed:

"Q. Will you tell us now, Mr. Miles, what the conversation was between Mr. Irving Weinstein and yourself on this occasion when you were going home with him in his pickup truck? A. Something just brought the union up and he said he didn't know what he was going to do with Mr. Harris.

"Q. Who brought the subject of the union up? A. Well, I don't remember it was me or whether it was him. I'm not sure.

"Q. What was said by Mr. Weinstein in that connection concerning the union or concerning Mr. Harris in connection with the union? A. He said he didn't know what he was going to do with him.

"Q. Well, how was that connected with the union? A. When you are in the union that way you can't fire no one while it's in session."

After questioning Miles as to Weinstein's statements to the witness about other things, counsel for the Board returned to Weinstein's statements about Harris:

"Q. Did he give you any reason why he made the statement that he didn't know what he was going to do about Enon Harris? A. Well, just tearing up equipment, I reckon that's about—* * * and having blowouts on the tires."

In his testimony as to the second conversation with Weinstein, Miles quoted

Weinstein as saying that if the union came in he would have to "set the trucks up, couldn't run them." Miles did not believe there were other statements made to him by Weinstein about the union or the Labor Board election.

 Counsel for the Board, at this point, apparently had doubts that a case of wrongful discharge had been established, and proceeded to question Miles about an affidavit prepared for his signature by a Field Examiner about four months earlier. Miles admitted that he signed the affidavit. Over objection of counsel for Hudson and Pioneer, Miles was required to read from the affidavit a statement that Weinstein had said to Miles "I know who started the union. If—it was Harris, and I don't know what I am going to do with him." He was also required to read from the affidavit the statement that Weinstein had said that he didn't know what he was going to do with Harris for bringing in the union. Miles gave an affirmative answer to a question as to whether he then recalled the conversations, and said the statements were true.

Miles was also required to read from the affidavit a statement that Baker had told Miles that "if the union does not go through Harris will be fired." Baker had no such place in the Hudson-Pioneer scheme of things as authorized him to speak for either of them and the Trial Examiner properly so held. See National Labor Relations Board v. Birmingham Publishing Co., 5 Cir., 1959, 262 F.2d 2.

Our task is to determine whether there is substantial evidence on the record as a whole to support the finding of the administrative agency that Harris was discharged for union activity. That finding is based upon the inference drawn from the recital in the affidavit of Miles written, not by Miles but by the Field Examiner of the Board, quoting Weinstein as saying that he didn't know what he was going to do with Harris for bringing in the union. The respondents, Hudson and Pioneer, objected to the use of the affidavit on the ground that counsel for the Board was attempting to impeach her own witness. The use of the affidavit would be impeachment if the purpose of its use was to show a prior inconsistent statement of the witness. The ground given at the hearing for the use of the affidavit was for the refreshing of the recollection of the witness. No other or better ground is assigned here. Resort to the use of an extra-judicial statement, previously made, for the purpose of refreshing the recollection of a witness, can be had only if the witness does not recall to mind the matters referred to in the prior writing. Vicksburg & Meridian Railroad v. O'Brien, 119 U.S. 99, 7 S.Ct. 118, 30 L.Ed. 299; 98 C.J.S. Witnesses § 358, p. 87; 58 Am.Jur. 324, Witnesses, § 580. Where the recollection of the witness is clear, there is no need for refreshing, and the use, in such case, of the prior statement would only serve to corroborate or to contradict the testimony of the witness based upon his present recollection. Neither is permissible. However vague and unsatisfactory other testimony of Miles may have been, there was no lack of clear and distinct recollection in his response to the question as to the reason given by Weinstein for his statement that he didn't know what he was going to do about Harris. Miles' answer was "tearing up equipment" and "having blowouts on tires."

It would seem that even though the recollection of Miles had required refreshing, the statement used for that purpose was too remote from the event to be available for the purpose. The Supreme Court has held that statements of a witness made four months after the event could not be used, and has thus stated the rule:

"The very essence, however, of the right to thus refresh the memory of the witness is that the matter used for that purpose be contemporaneous with the occurrences as to which the witness is called upon to testify. Indeed, the rule which allows a witness to refresh his memory by writings or memoranda is

founded solely on the reason that the law presupposes that the matters, used for the purpose, were reduced to writing so shortly after the occurrence, when the facts were fresh in the mind of the witness, that he can with safety be allowed to recur to them in order to remove any weakening of memory on his part, which may have supervened from lapse of time." Putnam v. United States, 162 U.S. 687, 16 S.Ct. 923, 926, 40 L.Ed. 1118. See Nardi v. United States, 6 Cir., 1926, 13 F.2d 710; Tibbitts-Hewitt Grocery Co. v. S. E. Lux, Jr., 8 Cir., 1925, 5 F.2d 549; 98 C.J.S. Witnesses § 360 b, pp. 97, 98.

Enough has been said to show the impropriety of requiring the witness Miles to read selected excerpts from his prior statements and obtaining from him a declaration as to the truth of them. The quotations from the statement and the declaration should be disregarded.

 The guides to decision in cases such as this are to be found in the prior decisions of this Court. The opposition of an employer to union organization and restraint, coercion and interference are not enough, without more, to make the discharge of an employee a wrongful one. National Labor Relations Board v. McGahey, supra; National Labor Relations Board v. Newton Co., supra. If the motivating cause of a discharge is the union activity of the discharged employee, then the discharge is, of course, unlawful, even though there might have been a proper ground for the discharge. It can hardly be questioned that the willful and admitted disobedience by Harris, of the instructions given to him to leave a note attached to the key of a truck needing repair, would be a proper ground for his discharge. Unlawful motives are not to be lightly inferred. National Labor Relations Board v. Fox Manufacturing Co., 5 Cir., 1956, 238 F.2d 211. If there are two grounds for discharge, one proper and the other unlawful, and the evidence as a whole would make the inferences as to which was the motivating cause reasonably equal, the conclusion reached by the Board should be sustained. National Labor Relations Board v. Fox Manufacturing Co., supra; National Labor Relations Board v. Newton Co., supra. These doctrines are fully developed in such decisions as those cited and in National Labor Relations Board v. Houston Chronicle Publishing Co., 5 Cir., 1954, 211 F.2d 848; National Labor Relations Board v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567.

In determining whether there is substantial evidence on the record as a whole to sustain the Board's determination that the discharge of Harris was unlawfully motivated by his union activity we must look to the portions of the testimony of Miles which are entitled to be considered. There is the testimony of Miles which quotes Weinstein as saying, "I know who started the union. If—it was Harris, and I don't know what I am going to do with him." This testimony does not justify an inference that Weinstein meant that he knew who started the union, that it was Harris, and that the reason he didn't know what he was going to do about Harris was because Harris started the union. Such an inference, if otherwise logical, would be inapt in the light of Miles' statement that the reason was because of Harris' tearing up equipment and blowing up tires. We find no other testimony to toss into the scales along with that of Miles on the wrongful discharge issue. Miles' testimony by itself is not enough. There were ample grounds for the discharge of Harris. The belief of Miles that "When you are in the union that way you can't fire no one while it's in session," is not the law. Even though Harris may have brought in the union and the employers didn't want it brought in, his discharge was not unlawful as the evidence as a whole does not justify the finding of wrongful motivation. Cf. National Labor Relations Board v. Birmingham Publishing Co., supra.

The Board's order directing back pay for and reinstatement of Harris will not

be enforced. The notice to be posted will, of course, be excised of references to his back pay and reemployment.

The petition for the enforcement of the Board's order will be

Enforced in part and denied in part.