**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MIRA-PAK, INC., Respondent.**

No. 22142.

United States Court of Appeals Fifth Circuit.

Dec. 29, 1965.

Rehearing Denied Feb. 7, 1966.

Hutcheson, Circuit Judge, dissented in part.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott C. Lichtman, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Wayne S. Bishop, Attys., N. L. R. B., for petitioner.

James E. Crowther, Houston, Tex., Butler, Binion, Rice, Cook & Knapp, Houston, Tex., of counsel, for respondent.

Before TUTTLE, Chief Judge, and HUTCHESON and COLEMAN, Circuit Judges.

TUTTLE, Chief Judge:

The Board here seeks enforcement of its Order issued on June 29, 1964 against respondent which is engaged in the manufacturing and servicing of automatic packaging machines. The Board found that respondent violated Section 8(a) (3) and (1) of the Act by discharging employees Gentry and Flygare because of their union activities. The Board further found that respondent violated 8(a) (1) of the Act by telling the employees they might be discharged for attending a union meeting, and by prohibiting union solicitations by employees during nonworking time.

Testimony which the Board credited, supported a finding of the following basic facts: In May, 1963, Gentry and Flygare met with some of the company's employees to discuss unionization of the plant. Gentry made a contact with Sheet Metal Workers Local No. 54, with whom he made arrangements for organization of the employees. He talked to "thirty to forty" of the sixty to sixty-five employees in the plant about signing union cards. Among those he asked to sign were Supervisors Rutledge and McNatt. Flygare assisted by asking a number of employees to sign cards. Flygare testified that "we had as many as thirty

guys at my house at one time and Rutledge was one of them."

Gentry arranged for the union to distribute pamphlets on the street in front of respondent's plant on the evening of June 4. On June 5, supervisory employee Gussman asked Gentry if he had "another of those pamphlets," stating that he would like to see it. Gentry replied that he did not have another pamphlet. The following morning Gentry was discharged. When Gentry asked his foreman, Evans why he was being discharged, the latter replied, "Well, your work is not up to standard." There was no overt act coincidental with the discharge that had given rise to any criticism of Gentry's work, although the record discloses that in the past he had not been an entirely satisfactory employee.

On June 15, the union again distributed handbills in front of the company's plant. Flygare had taken one of the union handbills back to his work bench. He drew a map on the reverse side of this handbill which, he testified, he did in order to show a fellow employee, Davis, how to reach his home to inspect a car Flygare was selling. In the exchange, which the undisputed testimony established took not more than thirty seconds, Flygare handed the handbill map to Davis as the latter approached the drinking fountain saying, "Here's a map how to get to my place to pick up the car." The witnesses do not recall whether Davis replied.

Almost immediately thereafter, the company president came to Flygare's machine and, according to Flygare's testimony, "He said he caught me talking union * * * he said he knew what our rights were and he knew what his rights were and he says that I was a fool if I didn't think he would do what he could, you know, to stop us." A few minutes later Foreman Evans came up to Flygare and discharged him.[1]

Although President Leasure told Flygare's friend, Arthur May, that Flygare had been discharged for a number of reasons, Evans told May that the discharge had been "for passing out union literature." Also, another supervisor named Gibson who was away from the plant at the time of the discharge, testified that Mr. Leasure had told him that Flygare "was fired for passing out union literature on Company time."

On the same day on which Flygare was discharged, Supervisor McNatt and Foreman Don Evans discussed a union meeting scheduled for that evening and McNatt asked Evans "would we get fired if we went over there?" Evans answered, "Yes." Immediately after this conversation, according to McNatt's testimony, he went out "and there were

---

1. Testimony concerning this firing was as follows:

"Q. What occurred next? A. About fifteen minutes later, Don Evans walked up to me and let me go.

"Q. When Mr. Evans walked up to you, tell us what Mr. Evans said to you and what you said to him. A. He said he was going to have to let me go, for me to go home, pick up my uniforms and come back and pick up my check, and I did that.

"Q. When you got your uniforms, you came back to the plant, is that it? A. That's right.

"Q. Who did you see at that time? A. I talked to Don Evans.

"Q. What did you say to him? A. I asked him why—I asked him if Bill Leasure told him to fire me. I asked him why. He said for passing out union literature.

"Q. All right. What did you say to him? A. I asked him how Bill Leasure figured he could get away with an excuse like that.

"Q. Did you tell Mr. Evans about the map? A. Yes, I did. I told him that there was a map written on the back of that handbill and that it didn't have anything to do with the union at all. He said, 'Well, it's too late now.'

I called Lynn Davis who was working on a machine about twenty feet away, and I asked him what was on that sheet of paper I gave him this morning. He said, 'It was a map how to get over to your car.'

"Q. Was this in the presence of Mr. Evans? A. Yes.

"Q. And Mr. Evans told you that, 'It's too late now,' is that it?"

about eight or nine of the men standing outside, and I told them to use their judgment about going, that they might get fired."

On June 20, after some discussion with Labor Board representatives,[2] respondent posted the following notice in the plant:

"TO ALL EMPLOYEES:

It has been the policy of the Company since its inception that no solicitation of any kind, whether for such organizations as United Fund, Insurance groups or any charitable or noncharitable promotional groups, has been permitted on the Company's premises. No exception has been made to this policy.

Accordingly, this notice will reaffirm the Company's non-solicitation policy.

Your strict adherence to this policy is requested.

W. C. Leasure
President"

There had previously been no broad solicitation rule in effect in the plant.

The respondent contends that there is no substantial evidence on the record as a whole to sustain the charges of discriminatory firing or of the 8(a) (1) violation by threats or coercion.

We deal first with the latter of the two points. From our recent opinion in NLRB v. Southwire Company, 5 Cir. 1965, 352 F.2d 346, November 1, 1965, it is clear that a No Solicitation rule that absolutely prohibits union solicitation on the company's property when employees are off duty in the absence of such special circumstances, as are discussed in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 113, 76 S.Ct. 679, 100 L.Ed. 975, is too broad, and such a published rule, under the circumstances here present, is violative of Section 8(a) (1) of the Act. See Republic Aviation

Corporation v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; NLRB v. Walton Manufacturing Co., 5 Cir., 289 F.2d 177, 180; NLRB v. Linda Joe Shoe Co., 5 Cir., 307 F.2d 355, 357.

Dealing next with the charges of discriminatory discharges, we conclude, first, that there is no merit in respondent's contention that there was no proof that respondent knew of the activities of Gentry and Flygare. It was not disputed that they discussed their activities with at least two supervisors directly. Moreover, credited testimony gives the fact of their activities as the reason for the discharge of one of the two men. In light of Gentry's position of leadership in the organization of the employees, and in light of the timing of his discharge, which was coincident with the passing out of union literature but not coincident with any overt act of poor workmanship or inefficiency, and not coincident with the pay period, we think it clear that the Board could draw the inference that the true motive for firing Gentry was his union activity.

So, too, must we conclude that the testimony to the effect that the company's president said that Flygare was discharged for union activity, both at the time of the discharge and subsequent thereto, was sufficient to warrant the conclusion by the Examiner and the Board that his discharge was motivated by a desire to stifle the union activity. As we have stated repeatedly, this Court " 'may [not] displace the Board's choice between two fairly conflicting views' and inferences, 'even though the court would justifiably have made a different choice had the matter been before it *de novo.*' " NLRB v. Coats & Clarke, Inc., 5 Cir., 231 F.2d 567, 572. Here there was sufficient evidence on the record as a whole to warrant the Board's drawing the in-

2. Although respondent says the company's representatives talked with Board lawyers before posting the No Solicitation rule, it is not contended that the Board or any of its representatives approved, or even saw, the rule as it was published. Respondent seems to say that the Board should have guided respondent more carefully or have sent respondent to a lawyer for advice. Obviously this occurrence cannot give any added validity to the rule.

ference that the discharges had been illegally made.

The Order will be enforced.

HUTCHESON, Circuit Judge (dissenting in part):

I am in agreement with the majority's disposition of the Section 8(a) (1) violation; I cannot, however, agree that the discharges of Gentry and Flygare were unlawful under the Act.

This court, before the amendment of the National Labor Relations Act, held without varying that association with or membership in a labor union is not a guarantee against discharge; that when real grounds for discharge exist, management may not be prevented from discharging; and that opposition to union organization, even to the point of restraint, coercion, and interference in violation of Section 8(a) (1), is not enough, without more, to make the discharge unlawful.[1] Thus "[m]anagement can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids." NLRB v. McGahey, 233 F.2d 406, 413 (5th Cir. 1956).

Congress has made abundantly clear its concurrence; Section 10(c) of the Act now reads, in pertinent part, "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." This amendment "was intended to, and did, give legislative approval to these views and corresponding disapproval to the practices of examiners and board to the contrary."[2] NLRB v. Fulton Bag & Cotton Mills, 175 F.2d 675, 677 (5th Cir. 1949). Accord, NLRB v. Ray Smith Transp. Co., 193 F.2d 142, 146 (5th Cir. 1951).

In the present case Respondent assigned a valid cause for the discharge of both Gentry and Flygare. The Board refused to accept the cause assigned and found that Gentry and Flygare were discharged because of their union activities. It must be remembered that "[a]n unlawful purpose is not lightly to be inferred."[3] NLRB v. McGahey, supra. With due deference to my colleagues of the majority, in my opinion the record before us "considered as a whole" does not present a substantial basis of believable evidence pointing toward an unlawful motive for the discharge, but rather indi-

---

1. General Tire of Miami Beach, Inc. v. NLRB, 332 F.2d 58, 60 (5th Cir. 1964); NLRB v. Texas Bolt Co., 313 F.2d 761, 763 (5th Cir. 1963); NLRB v. Georgia Rug Mill, 308 F.2d 89, 92 (5th Cir. 1962); Frosty Morn Meats, Inc. v. NLRB, 296 F.2d 617, 620–21 (5th Cir. 1961); NLRB v. Dan River Mills, Inc., 274 F.2d 381, 384 (5th Cir. 1960); NLRB v. Hudson Pulp & Paper Corp., 273 F.2d 660, 666 (5th Cir. 1960); NLRB v. Birmingham Publishing Co., 262 F.2d 2, 9 (5th Cir. 1959); NLRB v. Fox Mfg. Co., 238 F.2d 211, 214 (5th Cir. 1956); NLRB v. McGahey, 233 F.2d 406, 410–13 (5th Cir. 1956); NLRB v. Denton, 217 F.2d 567, 571 (5th Cir. 1954), cert. denied, 348 U.S. 981, 75 S.Ct. 572, 99 L.Ed. 764 (1955); Rubin Bros. Footwear v. NLRB, 203 F.2d 486, 488 (5th Cir. 1953); NLRB v. Ray Smith Transp. Co., 193 F.2d 142, 146 (5th Cir. 1951); NLRB v. Russell Mfg. Co., 191 F.2d 358, 359 (5th Cir. 1951); NLRB v. Fulton Bag & Cotton Mills, 175 F.2d 675, 677 (5th Cir. 1949), and cases cited 175 F.2d at 677 n. 6. See also American Ship Bldg. v. NLRB, 380 U.S. 300, 311–313, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 254, 59 S.Ct. 490, 83 L.Ed. 627 (1939); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45–46, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

2. See the Conference Committee Report on the Labor-Management Relations Act of 1947, in U.S.Code Cong.Serv., 80th Cong., 1st Sess. 1145, 1161 (1947).

3. Accord, NLRB v. Dan River Mills, Inc., 274 F.2d 381, 385 (5th Cir. 1960); NLRB v. Hudson Pulp & Paper Corp., 273 F.2d 660, 666 (5th Cir. 1960); NLRB v. Fox Mfg. Co., 238 F.2d 211, 215 (5th Cir. 1956).

cates that the Board based its finding on the Respondent's general animosity toward the union.[4] This in my opinion is contrary to the Congressional intent, and therefore I respectfully dissent.

---

4. In NLRB v. McGahey, 233 F.2d 406, 411 (5th Cir. 1956) we said:

"Each [of the stated causes for discharge] was a perfectly sufficient explanation for the discharge of the particular employee and would itself sustain the burden, if it rested upon the employer, that the discharge of each was for the stated reasons. But the employer does not bear this duty. It is, rather on the General Counsel to establish by acceptable substantial evidence on the whole record that discharge came from the forbidden motives of interference in employee statutory rights. The burden long imposed by this Court * * * has added sanction by express terms [of Section 10(c)] of the Act."

See also NLRB v. Dan River Mills, Inc., supra note 3; NLRB v. Birmingham Publishing Co., 262 F.2d 2, 8 (5th Cir. 1959); NLRB v. Fox Mfg. Co., supra note 3, at 214–215, and cases there cited.