**SAN ANTONIO MACHINE & SUPPLY CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 21687.

United States Court of Appeals
Fifth Circuit.

July 21, 1966.

Rehearing Denied Aug. 24, 1966.

Theo F. Weiss, L. Bruce Fryburger, San Antonio, Tex., Clemens, Knight, Weiss & Spencer, San Antonio, Tex., of counsel, for petitioner.

Elliott C. Lichtman, Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Warren M. Davison, Linda R. Sher, Attorneys, N.L.R.B., for respondent.

Before BELL and THORNBERRY, Circuit Judges, and FISHER, District Judge.

THORNBERRY, Circuit Judge:

This is a petition by San Antonio Machine & Supply Corporation for review of a decision and order of the NLRB. The Board has filed a cross-petition for enforcement of its order.

By substantially adopting the findings and conclusions of the Trial Examiner, the Board found that petitioner, by withdrawing from and repudiating agreements reached in the course of a series of bargaining sessions, failed to bargain in good faith with the Union (United Steel Workers of America), thereby violating Section 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (5) and 158(a) (1). The Board further found that a subsequent strike was substantially caused by petitioner's unfair labor practice and that petitioner violated Section 8(a) (3) and (1) of the Act by discharging employee Florence Alsbury because she gave aid and comfort to the Union by bringing refreshments to a picket.

In adopting the Trial Examiner's recommended order, the Board ordered petitioner to cease and desist from refusing to bargain with the Union and from discouraging membership in any labor organization of its employees by discriminating in regard to their hire and tenure of employment. Affirmatively, the Board ordered petitioner to bargain with the Union upon request, to reinstate with backpay the strikers and Florence Alsbury, and to establish a preferential hiring list for those strikers for whom positions might not be immediately available. Petitioner was also ordered to post appropriate notices.

Petitioner is engaged in the manufacture and distribution of industrial, water and plumbing supplies. On April 1, 1963, petitioner purchased certain assets from its predecessor of the same name. A collective bargaining contract between the Union and petitioner's predecessor was due to expire on April 12, 1963, and the Union had submitted a draft of proposed changes in the contract to petitioner's predecessor. Negotiations between the petitioner and the Union began on April 5, 1963. It was agreed that extended discussion of economic proposals would be held in abeyance, pending agreement on non-economic matters. Although it was clear from the beginning that the question of seniority would be difficult to agree upon, the testimony of petitioner's president (Lewis) and the Union negotiator (Ray) reflects that prior to the meeting of May 16 both sides were optimistic about the possibility of an agreement.

At the meeting of May 16, Clifford Shawd, a professional management consultant newly hired by petitioner, joined in the negotiations. Shawd stated that some of the tentative agreements previously reached might have to be reexamined in the light of administrative cost and offered to present a proposal on economic matters at the next meeting.

The next meeting was held on May 23. A new contract proposal was presented to Ray by petitioner's representatives. According to Ray, as he read over the new proposal he "blew his stack," since he found that "the whole thing had been

changed up considerably from what we had already agreed upon."

Ray also testified that when he asked Shawd whether this meant that the Company was withdrawing the tentative agreements already reached, Shawd replied, "Yes, the company has withdrawn all the tentative agreements they had with you." Ray did agree to go through the new proposal, item by item, however, and actually agreed to many of the articles. Ray rejected the proposal as a total package and testified that he informed petitioner's representatives that he was going to call in the Conciliation Service for aid in resolving the dispute.

Subsequently, on May 25 and 26, bargaining sessions were conducted by a mediator, but the parties were unable to reach any agreement. One concession was made by the Company with regard to seniority on May 26: The Company agreed to let seniority date back to service with the old company, but proposed substitution of the words "in the judgment of the management" in two places in the contract with reference to judging an employee's ability to perform the work. This was termed a "concession of sorts" by the Trial Examiner and was rejected by the Union.

At the conclusion of the May 26 meeting, Ray informed the Company representatives that because of their withdrawal of the tentative agreements and because the parties were therefore further apart than at the beginning of negotiations, the Union was going to strike. The strike began on Monday, May 27.

During June, July, August and September more bargaining sessions were held, with the principal topic of discussion being seniority. Ray testified that at a meeting on June 3, he offered to call off the strike if the Company would restore the tentative agreements as the basis for further negotiations, but that the Company president did not respond to this offer. The strike was ended by the Union on November 13, 1963, and numerous strikers wrote the Company offering unconditionally to return to work.

During the course of the strike, Florence Alsbury was discharged by petitioner. She was employed as a secretary in the Company's plumbing department, and her work consisted of filing, typing, waiting on customers and answering the telephone. Shortly after the inception of the strike, Mrs. Alsbury brought a soft drink and a sandwich to a picket at his request. (She was on her coffee break at the time.) This incident was observed by the office manager of the plumbing department (Novian) who in turn reported it to his superior (Heltebridle). The testimony concerning the events which transpired thereafter is in dispute and will be discussed later; at any rate, Heltebridle obtained permission from the Company vice-president to discharge Mrs. Alsbury, and she was discharged shortly after the incident.

Having reviewed the evidence in this general way, we now pass to a more detailed analysis of the Board's findings, bearing in mind that our scope of review is limited by the substantial evidence rule. Each of the alleged violations of the Act will be considered separately.

## I.

### The Alleged Failure to Bargain in Good Faith

The ultimate finding by the Trial Examiner on this question is as follows:

"I find that [petitioner] on and after May 23, 1963, by withdrawing from and repudiating agreements already arrived at, and by changing its position abruptly and without any announced reason, and maintaining its changed position without deviation except for a concession of sorts in the definition of continuous service, failed to bargain in good faith with the Union thus engaging in unfair labor practices in violation of Section 8(a) (5) and (1) of the Act."

At the outset it should be noted that there is really no dispute in the record that the Company did in fact withdraw from numerous tentative agreements which had been reached during the course of bargaining between the Company and the

Union. It is also clear that Ray objected to the Company's deviation from those tentative agreements and that this objection was conveyed to the Company.[1]

■ Petitioner's initial contention is that, because of the tentative nature of the agreements, the refusal of the Company to be bound by the agreements cannot constitute evidence of bad faith. In rejecting petitioner's contention, the Trial Examiner relied on Shannon & Simpson Casket Co., 99 NLRB 430, 30 LRRM 1081; enforced, 9th Cir. 1953, 208 F.2d 545, wherein the Board made the following statement:

"Apparently the Respondent seeks to justify certain of the above-described conduct by reliance on axioms of contract law. However, the rules by which it is determined whether the parties have made a contract are not the rules by which it is determined whether or not the parties have bargained in good faith. * * * The obligations under the Act contemplate that the parties come to the bargaining table with a fair and open mind and a sincere desire and purpose to conclude an agreement on mutually satisfactory terms. Reliance upon the rules of contract law so as to forestall and avoid agreement does not satisfy that obligation."

Petitioner correctly points out that the facts in the *Shannon & Simpson* case were stronger for the Board's position than those in the instant case; we are convinced, however, that the above-quoted language correctly states the general rule to be applied to a situation involving collective bargaining. The rule is stated in substantially the same language in Lozano Enterprises v. N.L.R.B., 9th Cir. 1964, 327 F.2d 814, at 818:

"In our view, the employer's arguments may be accepted as stating good technical contract law, but we do not think that in this particular case they state good collective bargaining law. We do not think that, in deciding whether, under a particular set of circumstances, an employer and a union have in fact arrived at an agreement that the employer is then obliged to embody in a written contract upon the union's request, the Board is strictly

1. The following testimony by Mr. Lewis, the Company's president, appears in the record:

"Q. With respect to the tentative agreements or withdrawal of the tentative agreements by the company Mr. Ray asked you at the May 23 session whether or not you were withdrawing the tentative agreements, did he not?

"A. Yes, he did.

"Q. Did you tell him that you were?

"A. Well, it all boils down to that. I told him that I really didn't feel that we were withdrawing the tentative agreements, that we had made some minor changes in them in preparation for submitting a seniority clause proposal that we were willing to live with if it was acceptable to them and we were submitting this for their consideration and—

"Q. Did you make this statement in your affidavit in page 17, 'At this meeting, when we had proceeded through the Company contract proposal to Article 14 [sic] [Article 4] dealing with holidays, Ray asked whether we were withdrawing tentative agreement to provisions which had been discussed at earlier meetings. I replied that if we had to face a seniority clause and had to agree to a seniority clause, we felt that there should be some adjustment in some of the other clause[s] in order to meet realities. Ray said, "in other words you are withdrawing the tentative agreements." I said, "I guess you could put it that way." ' Did you make that statement in your affidavit?

"A. I did."

* * * * *

"Q. * * * Did Mr. Ray object to the withdrawal of the tentative agreements while you were there?

"A. Yes."

* * * * *

"Q. All right, let's move on. Page 18 at the bottom, please follow me in the reading of this, 'Ray said that if the company would agree to everything that had been tentatively agreed upon earlier, there would be left approximately five to seven items on which the parties were in disagreement.' Did you follow me in the reading of that?

"A. Yes, sir, I did.

"Q. Did you understand from that that Ray was trying to get you to reinstate your tentative agreements?

"A. I think that is a reasonable conclusion, yes, sir."

bound by the technical rules of contract law."

A case decided by this Court which lends strong support to the Board's conclusion that petitioner's conduct was inconsistent with its statutory obligation to bargain in good faith is N.L.R.B. v. International Furniture Co., 5th Cir. 1954, 212 F.2d 431. There, at the employer's request, "the union submitted a new contract containing provisions that both parties had tentatively accepted," but the employer rejected the proposal. In granting the Board's petition for enforcement, this Court stated:

"The respondent's [employer's] reversal of position, its withdrawal of previous agreements, and its insistence upon substituting terms that had once been discarded, are indicative of a lack of good faith." Id., at 433.

See also N.L.R.B. v. Texas Coca-Cola Bottling Company, 5 Cir., 365 F.2d 321, decided June 27, 1966.

Petitioner further contends, however, that since the Union actually agreed to many of the provisions proposed by the Company on May 23, the finding of bad faith bargaining cannot be allowed to stand. This might be a persuasive argument if it could be shown that the union actually agreed to those proposed provisions which constituted changes from the previously reached tentative agreements. Our examination of the record, however, convinces us that there is substantial evidence to support the view that such was not the case. While Ray did agree to some of the Company's proposals, he also testified that he flatly rejected others. For example, with regard to the provision in the contract governing the temporary transfer of an employee to another job. (Article 14), Ray testified that the parties had previously agreed to employ the language in the old contract,[2] with the understanding that a temporarily transferred employee would have to work at least 30 minutes at the job to which he was transferred before he could receive the higher pay, if any, for that job.[3] The proposal submitted by the Company on May 23, however, provided that a transferred employee would not be eligible for the higher rate of pay until he worked two hours at his new assignment.[4] Ray's testimony clearly reflects that he did not agree to the Company's proposal of May 23.[5]

Similarly, with respect to the provisions in the contract governing vacations (Article 7), Ray's testimony indicates that the parties had agreed that the lan-

2. Article 14 of the old contract provided as follows:
"Section 1. When an employee is temporarily transferred to another job in a higher or lower classification, he shall be paid his regularly assigned job or the rate for the job to which he is transferred, whichever is higher."

3. The following testimony by Ray appears in the record:
"A. * * * I said that I had no objections to having the people work at least 30 minutes on this thing here and we agreed to the language in the old agreement there with the mutual agreement that they would have to work at least 30 minutes before they drawed the higher rate of pay.
"Q. All right. Isn't it true, Mr. Ray, that at some time at some meeting, either May 23rd or some subsequent meeting a compromise was agreed upon of one hour?
"A. No, it was not. * * *"
* * * * *

"TRIAL EXAMINER:
May 9, or whenever it may have been was one hour agreed upon?
"THE WITNESS:
No, sir. 30 minutes was."

4. Article 14 of the proposed contract submitted by the Company on May 23 provided as follows:
"Section 1. When an employee is temporarily transferred to another job in a higher or lower classification, he shall be paid his regular rate, then after two (2) hours in such assignment, be paid his regularly assigned job rate or the rate for the job to which he is transferred, whichever is higher."

5. "Q. All right. Going now to Article 14, Temporary Transfers, the company's proposal was that the temporarily transferred employee was to be paid the higher rate after two hours on the job. You said that was too long, didn't you?
"A. That's right."

guage in the old contract [6] was satisfactory. Ray testified that he wanted an additional section added to the old contract which would provide for an extra week's vacation for employees who had served fifteen years or more with the Company, but that this request was deferred as an economic matter. Ray's testimony clearly shows, however, that he believed that Lewis had agreed not to change any existing section of Article 7 of the old contract.[7] The proposal submitted by the

6. Article 7 of the old contract provided as follows:

"Section 1. An employee who has completed one year of continuous service with the Company on April 1 and who shall have worked at least sixteen hundred (1600) hours during the twelve (12) months period, shall be entitled to one (1) week's vacation with pay.

"Section 2. An employee who has completed five years of continuous service or more with the Company on April 1 and who shall have worked at least sixteen hundred (1600) hours during the twelve (12) months period, shall be entitle to two (2) week's vacation with pay.

"Section 3. In determining the number of hours of work necessary for an employee to become eligible for a vacation, as set forth in Sections 1 and 2 of this Article, an employee shall be given credit for all time lost due to injury occurring on Company premises or excused absence not to exceed, however, eight (8) hours for any one day or forty (40) hours for any one week.

"Section 4. The Company shall give consideration to the wishes and seniority of the employees in scheduling vacations. No employee shall be forced to take a vacation in lieu of layoff. Vacations are not cumulative from year to year.

"Section 5. The amount of weekly vacation pay to which an employee shall be entitled shall be computed by multiplying the average rate of his hourly earnings during the four (4) closest pay periods immediately prior to commencement of his vacation by the average number of hours he has worked per week during the four (4) closest pay periods immediately prior to commencement of his vacation which in no event for the purpose of this computation shall be less than forty (40) hours per week or eighty (80) hours for two weeks.

"Section 6. The payment of vacation pay shall be made to each employee entitled thereto on his last regular pay day preceding the commencement of his vacation."

7. Ray's testimony in this regard was as follows:

"Q. Did you discuss Article 7 dealing with vacations?

"A. Yes, we discussed Article 7. I read him [Lewis] Section 1 and told him on Section 1 that I would like to have this April 1st date changed to January 1 and he asked me why and I said well, because I think it makes it a lot easier actually to apply the vacations. Everybody here on April 1 would be entitled to the vacation who had completed 1600 hours. He said he didn't see any difference between April 1 and January 1st date, and he said he didn't see any difference in it. One was a calendar year and one was another year.

"So I said, 'Well, that's right.' I said, 'We'll just leave the thing like it is. We'll leave Section 1 like it is.'

"And he said it would be agreeable with him, to leave it like it was; he saw nothing wrong with that part of it. The same way with Section 2. Again we said that would be left the way it was. Mr. Lewis agreed to that.

"In between there now we had another section * * * and I read that to Mr. Lewis whereby we asked that an extra week's vacation be given to the employees with 15 years' service or more."

* * * * *

"I told him that we were asking that an extra week's vacation be given to people with 15 years service or over. He said again, he said that is an economic matter, and he said that it would raise the cost of the agreement up and that he would have to think that over, and we made no agreement on that part of it at that particular time."

* * * * *

"Now, Section 3, in Section 3 he said that he saw nothing wrong with this section here in agreeing to the language that was in this and that he did agree to this here and that whenever a man got hurt on the company property or anything that he should be given credit insofar as computing the 1600 hours."

* * * * *

"Q. Did you discuss Section 4 under Article 7 of the old contract * * *?

"A. Yes, we did. Mr. Lewis said that he saw nothing wrong with that, that he would give the senior employee a vacation if he could possibly let him off, and I explained to him what we meant here was if he just had one employee, that he could hold him back and give him his va-

Company at the meeting on May 23, however, not only added the qualification that in computing the number of hours worked during a given period, only "straight time" hours were to be considered, but also entirely deleted Section 3 of the old contract provision, by which an employee was given credit for time lost due to injury on company premises and excused absences.[8] As in the case of temporary transfers, the record clearly shows that Ray did not agree to the proposed changes in Article 7 submitted by the Company at the May 23 meeting.[9]

Our study of the record convinces us that the above instances were not the only ones in which the Company's departure from previously reached tentative agreements was rejected by Ray at the May 23 meeting. Aside from these instances of Company withdrawals from areas of prior actual agreement, however, there is other evidence in this record which indicates a lack of good faith at the bargaining table

on the part of the Company. Although it was clear from the beginning of negotiations that the parties would have difficulty in agreeing upon a seniority clause, Ray testified that at a bargaining session on April 26, 1963, he suggested to Lewis that Lewis prepare a seniority clause that would be satisfactory to the Company. Lewis did prepare such a proposal and submitted it to Ray at a meeting on or about May 1. According to Lewis, the May 1 proposal on seniority "was one with which the company could accomplish its very difficult goals." Ray's testimony corroborates this, since, according to Ray, Lewis told him that "this is a seniority proposal that the company feels like they could live with." The significant factor to be considered with regard to the Board's finding of bad faith bargaining is the marked changes which were made from this May 1 proposal by the Company itself when it submitted its new proposal on May 23. The following

---

cation when it was agreeable or feasible for the company to do so, but if he had two or three employees doing the same job what he should do is let the older employee go and when he come back let the next employee go and right down the line. Mr. Lewis agreed to that section.

"On Section 5, I read that to him and also explained to him how that would be applied. * * * He said, 'I can understand that.' He said, 'Go ahead and we will just leave that in there.'

"And I said, 'We will leave the thing in there like it is,' and I said, 'Okay.' "

\* \* \* \* \*

"Q. Did you discuss Section 6 of Article 7 with Mr. Lewis?

"A. I did.

\* \* \* \* \*

"Q. What was the discussion concerning Section 6 of Article 7?

"A. Well, it was up to Mr. Lewis, and Mr. Lewis said certainly he would agree to pay a guy for his vacation when he went on vacation. He didn't see any reason why he should hold the pay back. He said the guy needed money when he went on vacation, so he agreed to this."

8. Article 7 of the contract proposal submitted by the Company on May 23 provided as follows:

"Section 1. Any employee who has completed one year of continuous service with the Company on April 1 and who

shall have worked at least sixteen hundred (1600) *straight time* hours during the last twelve (12) months period, shall be entitled to one (1) week's vacation with pay.

"Section 2. An employee who has completed five years of continuous service or more with the company on April 1 and who shall have worked at least sixteen hundred (1600) *straight time* hours during the last twelve months period, shall be entitled to two (2) weeks vacation with pay.

"Section 3. The Company shall give consideration to the wishes and seniority of the employees in scheduling vacations. No employees shall be forced to take a vacation in lieu of layoff. Vacations are not cumulative from year to year.

"Section 4. The amount of weekly vacation pay to which an employee shall be entitled shall be 40 times his *straight time* base rate for each week of vacation.

"Section 5. The payment of vacation pay shall be made to each employee entitled thereto on his last regular pay day preceding the commencement of his vacation." (Emphasis added.)

9. Ray's testimony on this point is as follows:

"Q. All right. Now, Article 7 dealing with vacations, you said that was not satisfactory to you?

"A. That's right, the whole thing."

examples illustrate the extent to which the Company's May 23 proposal regarding seniority departed from the Company's May 1 proposal, to the Union's detriment:

1. The May 1 proposal provided that new employees of the Company "shall be probationary employees until they have worked sixty (60) calendar days * *." The May 23 proposal changed the sixty-day requirement to ninety days.

2. In cases of promotion and decrease in forces or rehiring after layoffs, the May 1 proposal listed ability to perform the work, physical fitness and continuous service as factors to be considered. The May 23 proposal added a new, somewhat ambiguous factor: "availability and potentiality."

3. The May 1 proposal provided that it "shall be the policy of the Company in filling new jobs and job vacancies to promote from within the departments in which new jobs or vacancies occur." The May 23 proposal added a condition—that such departmental promotions would be carried out "where practicable."

4. There were also considerable differences in the two proposals in the calculation of continuous service.[10]

We do not mean to imply that the Company's proposal on seniority would be unreasonable or in bad faith in another context; we are concerned only with the facts in this case. Although Ray certainly did not agree to all of the Company's suggestions of May 1 with regard to seniority, Lewis himself testified that Ray

10. The two proposals on this point are set out below, with the significant changes from the May 1 proposal italicized in the May 23 proposal:

*May 1 proposal:*
"2. Continuous service shall be broken by any of the following:
  a. If an employee quits.
  b. If an employee is discharged; provided that if the employee is rehired within six (6) months after the discharge, the break in continuous service shall be removed.
  c. The permanent shutdown of the plant, warehouse or any department or subdivision thereof; provided that if the employee is rehired within six (6) months after the layoff, the break in continuous service shall be removed.
  d. If an employee shall be absent because of temporary layoff or physical disability, he shall continue to accumulate continuous service during such absence up to a maximum of six (6) months.
  e. Absence due to compensable disability under the Workmen's Compensation Law incurred during the course of employment shall not break continuous service provided such individual returns to work within thirty (30) days after final payment of statutory compensation for such disability."

*May 23 proposal:*
"2. Continuous service shall be broken by any of the following:
  a. If an employee quits.
  b. If an employee is discharged, provided that *at the discretion of the company* if the employee is rehired within six (6) months the break in continuous service *may* be removed.
  c. Permanent shutdown of a plant, department or subdivision thereof, provided that if the employee is rehired *within three (3) months*, the break in continuous service shall be removed.
  d. An employee laid off due to a reduction in force. ["*physical disability*" omitted] shall continue to accumulate continuous service up to a maximum of *three (3) months; provided, however, that such continous service beyond the first thirty days of such layoff shall not accrue in the computation of vacation eligibility.* An employee absent due to compensable disability suffered in the course of his work with the present employer shall continue to accumulate continous service *to a maximum of twelve months dating from the first date of his absence due to such injury;* provided such individual returns to work *within fifteen (15) days* after final payment of statutory compensation for such disability and before the expiration of such disability *and before the expiration of the twelve month period provided above; provided however, that such absence exceeding thirty days shall not accrue in the computation of vacation eligibility.*"

agreed to some of them. Even more important, however, is the fact that the May 1 proposal was submitted to Ray as one which would be satisfactory to the Company. We are therefore satisfied that the Board could properly conclude that the significant alterations in the seniority clause which the Company made on May 23 constituted a "reversal of position" and are thus "indicative of a lack of good faith." N.L.R.B. v. International Furniture Co., supra, 212 F.2d at 433.

The Company's next contention is that, assuming that the Company was guilty of a failure to bargain in good faith in violation of Section 8(a) (5), the Board erred in holding that the strike which began on May 23, 1963, was caused by the alleged unfair labor practice. Specifically, the Company contends that since the strike vote was taken some two weeks before the May 23 meeting, the strike itself could not be attributable to any change in Company position at that meeting but was instead attributable to the impasse over seniority. We find substantial evidence in the record contrary to the Company's position. As stated earlier, Ray testified that on June 3, 1963, he proposed the resumption of negotiations if the Company would restore the tentative agreements, but that this offer was not accepted by the Company. Furthermore, Ray testified that he informed Lewis shortly after the strike vote was taken that the Union did not intend to strike but wanted to continue to negotiate. The strike vote was explained by Ray as being customary upon the termination of a contract.

While we have little doubt that one of the causes of the strike was the impasse over seniority, we are unable to conclude that the Board was in error in finding that the Company's numerous changes in position were also a cause of the strike. This is all that is required, as is shown by this Court's language in N.L.R.B. v. Birmingham Publishing Company, 5th Cir. 1958, 262 F.2d 2, 9–10:

"We agree with the Board's holding in regard to the strike of July 10, 1956. The strike was based, at least in part, on the Company's unfair labor practices; we cannot say that it was based only on economic reasons. The evidence in support of the Board's finding is that the reason for the strike was the Company's participation in the certification proceedings (which we hold to be an unfair labor practice) and the Edwards discharge (which we hold was not an unfair labor practice). The Company contends that the cause of the strike was the Union's failure to obtain a contract, and that the strike was purely a tactical maneuver.

"Again, *we need not find only one motivating reason. If there was a casual connection between the unfair labor practices and the strike, the striking employees are entitled to reinstatement.* On the record, the practice we find to have been unfair labor practices were a *contributing cause* of the strike. The striking employees * * * must be offered reinstatement in accordance with the order of the Board." (Emphasis added.)

See also N.L.R.B. v. Wichita Television Corporation, 10th Cir. 1960, 277 F.2d 579, 584, cert. denied, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93.

In summary, we hold that there is "substantial evidence on the record considered as a whole"[11] to support the Board's findings that petitioner failed to bargain in good faith with the Union in violation of Sections 8(a) (5) and (1) of the Act, and that a contributing cause of the strike which began on May 27, 1963, was this unfair labor practice.

## II.

### The Discharge of Florence Alsbury

It is undisputed that, shortly after the strike began, Mrs. Alsbury purchased refreshments for a picket while on her coffee break. It is also undisputed that this incident was observed by office manager Novian, who reported it to his supervisor, Heltebridle. Soon after the incident, Mrs. Alsbury was discharged by

11. 29 U.S.C. § 160(f).

Heltebridle. According to Mrs. Alsbury's testimony, she was not informed of the reasons for her discharge.

■■ Petitioner contends that Mrs. Alsbury was discharged for inattention to her work. Specifically petitioner asserts that the incident which triggered her discharge was her failure to be at her desk on the afternoon of May 28, 1963, when a customer came in. Mrs. Alsbury testified that she was at her desk during the entire afternoon of May 28. Furthermore, on cross-examination, several discrepancies were shown in Heltebridle's version of the events surrounding Mrs. Alsbury's discharge. The Trial Examiner expressly credited Mrs. Alsbury's testimony, found that petitioner discharged her because she gave aid and comfort to the Union's cause, and further determined that in so discharging Mrs. Alsbury, petitioner discouraged membership in a labor organization in violation of Section 8(a) (3) and (1) of the Act.

On the basis of the record before us, these findings by the Trial Examiner, which were adopted by the Board, cannot be disturbed. The applicable rule was stated succinctly by this Court recently in N.L.R.B. v. Mira-Pak, Inc., 5th Cir. 1965, 354 F.2d 525, 527–28:

"As we have stated repeatedly, this Court 'may [not] displace the Board's choice between two fairly conflicting views' and inferences, 'even though the court would justifiably have made a different choice had the matter been before it de novo.' NLRB v. Coats & Clarke, Inc., 5 Cir., 231 F.2d 567, 572. Here there was sufficient evidence on the record as a whole to warrant the Board's drawing the inference that the discharges had been illegally made."

### III.

### Scope of the Board's Order

In the alternative, petitioner urges that those parts of the Board's order which command the Company (a) to cease and desist from "refusing to bargain collectively" and (b) upon request, to "bargain collectively with the Union" are too broad.[12] Petitioner suggests that the order be limited to a command to cease and desist from repudiating or withdrawing the contract provisions actually agreed upon and from substituting proposals or conditions less favorable than those previously agreed upon.

■ Petitioner relies on the rule that an NLRB order must state with reasonable specificity the acts which the employer is to do or refrain from doing. This rule was recognized in N.L.R.B. v. Express Publishing Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930, but there the Court made it clear that an order similar to that drafted by the Board in the instant case would not be considered unduly broad:

"The Board, having found in this case that respondent had refused to bargain, that part of its order directing respondent to 'cease and desist from refusing to bargain collectively' with the Guild, was in exact compliance with the statute and should have been left undisturbed by the judgment below." Id., at 432, 61 S.Ct. at 698, 85 L.Ed. at 935."

The Supreme Court also concluded that only that portion of the Board's order which sought to restrain other unlawful practices "which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct" should be struck down. Id., at 433, 61 S.

12. The two paragraphs in question are paragraphs 1(a) and 2(a) of the Board's order. They provide that the Company shall:
"1. Cease and desist from:
(a) Refusing to bargain collectively with United Steelworkers of America, AFL-CIO, as the exclusive bargaining representative of its production and maintenance employees.

*    *    *    *    *
"2. Take the following affirmative action designed to effectuate the policies of the Act:
(a) Upon request, bargain collectively with the Union as the exclusive representative of its production and maintenance employees and, if an understanding is reached, embody such understanding in a written agreement."

Ct. at 698, 85 L.Ed. at 936. Clearly, under the *Express Publishing Co.* case, the command to bargain collectively with the Union is sufficiently related to the finding of refusal to bargain and need not be modified.

The Company's petition is denied and the Board's cross-petition for enforcement is granted. The order of the National Labor Relations Board is enforced.